**Scott N. BERGMAN, Appellant,**

v.

**DISTRICT OF COLUMBIA, et al., Appellees.**

**No. 08–CV–859.**

District of Columbia Court of Appeals.

Argued Oct. 1, 2009.

Decided Jan. 14, 2010.

Michael T. Anderson, Washington, with whom Keira M. McNett and Jamin B. Raskin were on the brief, for appellant.

Richard S. Love, Deputy Solicitor General for the District of Columbia, with whom Peter J. Nickles, Attorney General, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee District of Columbia.

John R. Hoellen, Deputy General Counsel, with whom Brian K. Flowers, General Counsel, was on the brief, for appellees Members of the Council of the District of Columbia.

Before BLACKBURNE–RIGSBY and OBERLY, Associate Judges, and SCHWELB, Senior Judge.

SCHWELB, Senior Judge:

Scott N. Bergman, a member of the District of Columbia Bar, brought this action against the District of Columbia and the Members of the Council of the District of Columbia,[1] challenging the validity of the White Collar Insurance Fraud Prosecution Enhancement Amendment Act of 2006 ("the Act"), D.C. Law 16–144 (Act 16–340), 53 D.C.Reg. 2828 (effective July 25, 2006), codified at D.C.Code § 22–3225.14 (2009 Supp.). Bergman asserted that the Act unconstitutionally restricts his freedom of speech and constitutes impermissible "viewpoint discrimination." Bergman also alleged that in enacting this statute, the Council violated the District of Columbia Home Rule Act ("HRA"), D.C.Code §§ 1–201.01 et seq. (2007 Supp.) and the "separation of powers" doctrine by "usurp[ing] the judiciary's power to regulate the conduct of D.C. attorneys."

The trial judge rejected these contentions and granted the motions of the District and the Council Members for summary judgment. On appeal, Bergman contends that the trial judge erred in her ruling with respect to each of his claims. We affirm.

## I.

### THE TRIAL COURT RECORD

#### A. Legislative Background

The Act makes it unlawful for "practitioner[s]" to solicit business from "a client, patient, or customer within 21 days of a motor vehicle accident with the intent to seek benefits under a contract of insurance or to assert a claim against an insured, a governmental entity, or an insurer on behalf of any person arising out of the accident." D.C.Code § 22–3225.14(a)(1).[2] A "practitioner" is defined as "a person, licensed to practice a profession or trade in the District, whose services are compensated either in whole or in part, directly or indirectly, by insurance proceeds." D.C.Code § 22–3225.01(9). The Act thus applies not only to lawyers, but to "all relevant practitioners (e.g., attorneys, health care professionals, and others licensed to practice a profession or trade in

---

1. The basis upon which relief was sought against individual Council Members is unclear. In light of our disposition of this appeal, however, we do not address this issue.

2. The Act prohibits in-person and telephone solicitations, and in this opinion, we shall refer to these prohibited activities collectively, for convenience, as "in-person solicitation."

the District)." D.C. COUNCIL, REPORT ON BILL 16–208 at 1 (Feb. 7, 2006).

The Act contains several exemptions from this twenty-one day prohibition. It permits immediate solicitation of legal business from accident victims through the mail, and the proscription against in-person solicitation does not apply if there is a preexisting relationship between the practitioner and the person solicited, or if the contact is initiated by the "potential client, patient, or customer." D.C.Code § 22–3225.14(a)(2). The Act also provides that any release of liability executed within twenty-one days of an accident "without the assistance or guidance of legal counsel" is voidable within 14 days of the execution of such a release. D.C.Code § 22–3225.14(d)(1). It further requires that any such release "shall contain a notice of the claimant's right to rescind conspicuously and separately stated on the release." *Id.* § (d)(2).

The Act was intended to address "an existing problem with practitioners (or their agents) soliciting accident victims." D.C. COUNCIL, COMMITTEE ON THE JUDICIARY, REPORT ON BILL No. 16–208 (hereinafter "REPORT") at 1 (Nov. 8, 2005). The Act also prohibits the Metropolitan Police Department (MPD) from releasing "reports of motor vehicle accidents" within twenty-one days of an accident to persons who are barred by § 22–3225.14 from soliciting clients, unless the individual requesting the report presents identification and certifies that he or she is eligible to obtain the report pursuant to the Act. D.C.Code § 5–113.06(c). However, practitioners are authorized to receive accident reports immediately if they represent, under oath, that they will not use them to solicit in-person legal business within twenty-one days after

an automobile accident. Councilmember Phil Mendelson, the Chairman of the Judiciary Committee, explained that the bill "is a consumer protection measure which serves to protect accident victims from being victimized a second time—by harassing phone calls and other personal contact looking for business out of the accident." REPORT, at 1. The Act was passed unanimously by the Council.

While considering the proposed legislation, the Council received extensive information regarding the practices sought to be prohibited and the effects of these practices upon victims of accidents and their families. The legislative record included, *inter alia,* sworn statements of persons who had been subjected to unwanted and intrusive solicitation at all hours of the day and night, testimony from representatives of several Bar groups, and articles in the press describing the specific practices of practitioners who engaged in this type of solicitation and also the practices of the practitioners' agents, known as "runners." [3] A detailed description of the kinds of problems that the Act was designed to address is contained in the July 12, 2005 testimony of Kenneth M. Trombly, a past president of the Trial Lawyers Association of Metropolitan Washington, D.C., before the Judiciary Committee, and we quote from that testimony at length:

Mr. Chairman, if you had the misfortune to be involved in a motor vehicle accident in the District of Columbia, you would very likely encounter the following scenario. There is a good chance that a person known as a runner would come to the accident scene. He or she might interfere with the ambulance personnel or other person there to help you. Before you leave the scene, the tow-

---

**3.** *See* Holly Bailey, *Crash Chorus,* WASHINGTON CITY PAPER, February 2003, at 11; Libby Copeland, *Streets Strewn With Glass, Gold; "Run-* *ners" Make a Living Off D.C. Car Wrecks,* WASHINGTON POST, May 1, 2003, at A1.

truck operator might try to steer you to a certain law firm that pays him for referrals. At the emergency room you might likely be solicited by someone who is receiving a kickback from a lawyer. And then when you got home, hoping for a little peace and quiet, perhaps having a sleepless night due to the anxiety and the physical discomfort you are experiencing, you would be awakened early the next morning by persons calling you at home—because in the world of the runner, a man's home is not his castle. They will have picked up the police report the night before or that very morning and will be on the phone, trying to convince you to let them come to your house with a retainer agreement so that you can hire a lawyer for whom they work. Even if you are not injured, or do not wish to make a claim, they would likely try to talk you into making a claim. "It's easy money," they would say. "Just go to this chiropractor—Just let me come by and I will have some papers for you to sign." By the end of the day you might have received dozens of such phone calls.

The runners pay signing bonuses to clients, they get kick-backs from some health care providers to steer people to their offices, they make promises of easy money and they encourage frivolous claims. There are also a small number of lawyers, who apparently make these calls themselves, and eliminate the middle man. Of course, intrusive, uninvited solicitation is no less offensive because a lawyer, rather than a runner, is making the call or the home or hospital visit.[4]

According to the May 1, 2003 article in The Washington Post, see note 3, *supra,* one attorney stated that each year, he paid at least $100,000 to "runners."

Several accident victims, all of whom had suffered injuries ranging from sore backs and necks to headaches and, in one case, a fractured wrist, reported their experiences with solicitation practices of the kind described by Mr. Trombly. One of the victims was awakened by a telephone call at 6:00 a.m. on the day after the accident from a "seemingly desperate individual who wanted me to talk to his attorney," and he received multiple similar calls throughout the morning until he stopped answering the telephone. A second affiant promptly contacted his own attorney, and that attorney sent an investigator out

> to have me sign papers. In the meantime, someone else presented at my house and told me he was an investigator for an attorney. I signed the papers with him but he was not the investigator from my attorney but rather one for another attorney, whom I had never contacted.

Another victim reported calls from "5 or 6 attorneys who were trying to get my business[,]" and she stated that the calls all came between 9:00 p.m. on the evening of the accident and 6:30 a.m. on the following day. An attorney who was injured in an

---

4. In its November 8, 2005 Report to the Council, *supra,* at 1–2, the Judiciary Committee described the problem as follows:

> Practitioners hire intermediaries to solicit accident victims in hopes of filing claims; these intermediaries are commonly known as "runners." Runners often engage in aggressive tactics to obtain accident victims' personal information and then to solicit their business. For example, runners regularly line up at police stations to obtain copies of police accident reports which detail the name and personal information for those involved in the incident. The runners then proceed to cold-call or visit the victims in hopes of convincing individuals to file claims. Typically the runners are paid by practitioners for each successful referral. This practice was vigorously protested at the public hearing by a wide range of witnesses.

automobile accident wrote that she was released from the hospital at 1:00 a.m. with pain medication because her head and neck hurt "pretty badly." She stated that she received multiple telephone solicitations shortly thereafter, the first being from an "investigator" who called at 7:00 a.m., with a dozen more calls and voice mail messages before noon.[5] Bergman himself acknowledged in an affidavit that he made approximately 4,000 solicitations per year—i.e., an average of approximately eleven per day, seven days a week—and as the appellees point out, he was just one lawyer. Keith W. Watters, Esquire, who testified on behalf of the Bar Association of the District of Columbia on July 12, 2005, stated that "[r]unners and the lawyers who employ them have cast a shadow on the legal profession and the legitimate claims of injured parties." He added:

> Once the accident report was viewed, the accident victim[s] and their family can expect an unrelenting barrage of telephone call[s] and in person solicita-

tions starting at 5:00 a.m. in the morning. One victim reported 17 calls in one day. Runners are outlawed in 49 states. We would strongly recommend that the District immediately ban this distasteful and corrupt practice.

Taken as a whole, the legislative record supports a finding that even if no overly aggressive tactics were employed—a dubious assumption—the sheer number and frequency of the telephone calls and in-person contacts to which many accident victims were subjected in the immediate aftermath of an accident could be extremely disturbing and unsettling.[6]

### B. *The Trial Judge's Ruling*

On May 23, 2008, the trial judge granted summary judgment in favor of the defendants in a thoughtful and well-crafted order in which she rejected both of Bergman's challenges to the Act. The judge began by addressing the First Amendment issue. She described the conduct at which the Act was aimed as "commercial speech,"

---

5. The injured attorney told some of the lawyers who solicited her business that she was a member of the Bar herself. She asked them for their Bar numbers "just to gauge their reaction." She reported that "there was some stammering, stuttering, and a quick farewell."

6. Obviously, not all members of the Bar supported the proposed Act, and after its passage, opponents complained bitterly regarding its operation. In an affidavit filed in the instant action, plaintiff Scott W. Bergman stated, *inter alia*:

> Since the enactment of DC Law 16–0144, this law has caused serious harm to my legal practice and my effectiveness to represent auto accident victims in the District of Columbia. I have been unable to obtain any DC PD–10 police reports in order for my firm to make the allowable arm's length contact by phone and/or mail to victims of these unfortunate auto accidents that occur within the District. I am also subject to unnecessary prosecution by having to prove that every client that I represent post enact-

ment of [§ ] 16–0144 falls within the guidelines of the new law in order to avoid prosecution and loss of my license to practice law. Further, several employees of my firm have [been] treated harshly and unconscionabl[y] by employees of the Washington DC Metropolitan Police Department at various District station houses and they have all [been] denied access to view and/or copy DC PD–10 auto accident police reports since the enactment of DC Law 16–0144.

Bergman claimed that many of the persons whose business he solicited were poor, had limited education, and were unaware of their rights. He argued that in the absence of in-person solicitation, such persons have no realistic access to counsel even if they have meritorious claims. Another attorney, Robert L. Berkebile, Esquire, stated in an affidavit that as a result of the passage of the Act, he had to "scale back [his] practice and would have to release employees because of the lack of automobile cases coming into [his] practice."

and she held that it was therefore subject to "intermediate scrutiny." She concluded that the Act passed muster under this standard because it was narrowly drawn and because it directly and materially advanced a substantial government interest, namely, the protection of the privacy of citizens and consumers in the District of Columbia.[7]

The trial judge was unpersuaded by Bergman's claim that the Act constituted "viewpoint discrimination." In support of that contention, Bergman relied primarily on *R.A.V. v. City of St. Paul, Minnesota,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). The judge pointed out, however, that in *R.A.V., id.* at 388–89, 112 S.Ct. 2538, the Supreme Court "recognized that state regulation of client solicitation by attorneys for remuneration is not viewpoint discrimination." The judge concluded that "[t]he restriction at issue here is not aimed at the content of speech, but at its secondary effects." She further explained:

> The Supreme Court in *R.A.V.* also noted that no issue of content discrimination is raised where there is no realistic possibility that official suppression of ideas is afoot. 505 U.S. at 390, 112 S.Ct. 2538. There plainly is no such realistic possibility here, given that the restriction is only for 21 days and that contacts by

mail are permitted even during that period.

The judge noted that in *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 620, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995), decided three years after *R.A.V.,* the Supreme Court upheld a substantially broader restriction of solicitation by attorneys than that imposed by the Act.

The trial judge also rejected Bergman's contention that the Act contravenes the HRA. She correctly described the issue presented as being whether this court's authority to regulate the practice of law is exclusive "so as to preclude the Council from exercising its police power to address matters that otherwise would clearly be within its legislative purview, if the legislation also restricts the professional conduct of attorneys." The judge disagreed with Bergman's claim, based on *Banks v. District of Columbia Dep't of Consumer and Regulatory Affairs,* 634 A.2d 433 (D.C. 1993) (*Banks II*), and *In re Banks,* 805 A.2d 990 (D.C.2002) (*Banks III*), that this court's authority to regulate the practice of law is "exclusive." She observed (accurately) that the language in these decisions relied on by Bergman was dictum, and that it was based on an inaccurate citation of an earlier precedent.[8]

The judge concluded that the Act does not violate the HRA because it "does not directly affect the organization or jurisdic-

---

**7.** The judge also relied on the presumption of constitutionality, as articulated in *Hornstein v. Barry,* 560 A.2d 530, 533 (D.C.1989) (en banc). It is not at all clear that this presumption applies to legislation regulating commercial speech. *Compare State v. Casino Mktg. Group,* 491 N.W.2d 882, 885 (Minn.1992) ("a strong presumption in favor of the constitutionality of a statute governing commercial speech would run an unacceptable risk of chilling protected speech") *with H.J. Wilson Co. v. State Tax Comm'n,* 737 So.2d 981, 1009 (Miss.1998) (dissenting opinion) (adopting unpublished opinion of Chancery Court) (court should be "mindful . . . of the presumption of

constitutionality" in cases involving commercial rather than political speech); *see generally Glickman v. Wileman Bros. & Elliott, Inc.,* 521 U.S. 457, 477, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1977). Because we conclude that even absent a presumption of constitutionality, the Act does not violate the First Amendment, we take no position with respect to whether or to what extent that presumption applies in this case.

**8.** The opinions in *Banks II* and *Banks III* are discussed in detail in Part II C, *infra.*

tion of the District of Columbia courts, nor does it interfere with the Court of Appeals' authority over Bar admission or attorney discipline." She described the Act's temporary restriction on in-person solicitation as "a narrowly drawn anti-fraud criminal and consumer protection statute intended to protect against harassment of motor vehicle accident victims and the invasion of their privacy, in the immediate aftermath of an accident," and she held that the Act "does not unduly burden the Court of Appeals in the exercise of its core functions." This timely appeal followed.

## II.

### THE FIRST AMENDMENT CLAIM

#### A. *Commercial Speech*

█ Bergman's claim that the Act denies him the freedom of speech guaranteed by the First Amendment raises a constitutional issue of considerable moment, for it implicates "the core values of a free society." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 595 (D.C.2000). "The guarantee of free speech ... forms the constitutional and philosophical bedrock of our Republic." *Id.* Indeed, "the free flow of ideas and opinions is integral to our democratic form of government." *Id.* (quoting *Ollman v. Evans*, 242 U.S.App. D.C. 301, 305, 750 F.2d 970, 974 (1984) (en banc) (plurality opinion), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985)). "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other

ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Guilford*, 760 A.2d at 596 (quoting *Gertz*). The Council is therefore barred from prohibiting the advocacy of an idea or the communication of an opinion because it disagrees with the speaker's message. "More than two centuries ago, the French philosopher, Voltaire, anticipatorily articulated the spirit of our First Amendment when he [reportedly] wrote to Helvetius that 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Guilford*, 760 A.2d at 595–96.

█ This case, however, is not about the benign democratic ideal of opposing views competing for public acceptance. Rather, it is about practitioners aggressively seeking to secure potentially profitable business. As the Supreme Court stated in *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 459, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), "[a] lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns. It falls within the State's proper sphere of economic and professional regulation." [9] Regulation of commercial speech is reviewed under the "intermediate scrutiny" standard, which is less rigorous than the "strict scrutiny" that is applied to restrictions on non-commercial speech. *Id.* at 456–57, 98 S.Ct. 1912; *see also Went For It*, 515 U.S. at 623, 115 S.Ct. 2371.

Although Bergman depicts the issue in this case as involving a battle of ideas—

---

9. "[T]he solicitation of business by a lawyer through direct, in-person communication with the prospective client has long been viewed as inconsistent with the profession's ideal of the attorney-client relationship and as posing a significant potential for harm to the prospective client." *Ohralik*, 436 U.S. at 454, 98 S.Ct. 1912. It is also worth reiterating, in this connection, that "[t]he rules are based in part on deeply ingrained feelings of tradition, honor and service. Lawyers have for centuries emphasized that the promotion of justice, rather than the earning of fees, is the goal of the profession." *Id.* at 460, 98 S.Ct. 1912 (citation omitted).

fighting for the accident victim's rights against surrender of the victim's claim by settlement without the benefit of legal advice—the critical and dispositive fact is that we are dealing here with uninvited attempts to secure employment for remuneration—a classic example of a business transaction. *See Ohralik,* 436 U.S. at 459, 98 S.ct. 1912.[10] Nevertheless, since the First Amendment is marginally implicated, *id.,* the regulation (i.) must address a "substantial interest"; (ii.) must "directly and materially advance that interest"; and (iii.) must be "narrowly drawn." *Went For It,* 515 U.S. at 624, 115 S.Ct. 2371 (quoting *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 564–65, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). In our view, the Act satisfies all of these criteria.

### (1) *The District's substantial interest.*

We are satisfied that the Act addresses a substantial governmental interest, namely, the protection of consumers from unsolicited and often distressing one-on-one intrusions upon their privacy, effected for the purpose of securing their business in the immediate aftermath of an automobile accident, a time when many of them are likely to be in physical or emotional distress or in vulnerable circumstances.

In *Went For It,* which we consider dispositive of the First Amendment issue in this case, the Supreme Court held that a Florida Bar rule prohibiting "personal injury lawyers from sending targeted direct-mail solicitations to victims and their relatives for 30 days following an accident or disaster" did not violate the First Amendment (as applied to the State of Florida by the Fourteenth). 515 U.S. at 620, 115 S.Ct. 2371. The Court so held even though solicitation by direct mail is far less intrusive [11] than the kinds of solicitation by uninvited personal visits or unwanted telephone contacts at issue in the present appeal. The Court concluded in *Went For It* that Florida had "a substantial state interest in protecting the privacy and tranquility of personal injury victims and their loved ones against intrusive, unsolicited contact by lawyers." *Id.* at 624, 115 S.Ct. 2371. The Court stated (that "[o]ur precedents also leave no room for doubt that the protection of potential clients' privacy is a substantial state interest,") *id.* at 625, 115 S.Ct. 2371 (quoting *Edenfield v. Fane,* 507 U.S. 761, 769, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)) (internal quotation marks omitted). Moreover, "the State bears a special responsibility for maintaining standards among members of the licensed profes-

**10.** We agree with the following statement in the brief for the Council Members:

Mr. Bergman has conflated a communication whose primary purpose is to secure the accident victim as a paying client with the inextricably linked provision of legal advice, which presumably would convey a viewpoint contrary to that which might be provided by an insurance agency or its agents or a defense lawyer. The conceptual problem with this argument is that Mr. Bergman or any other attorney who wishes to convey unsolicited legal advice to an accident victim within twenty-one days of an accident may do so in person as long as the attorney is not securing that victim as a client for remuneration. The Supreme

Court in *Ohralik* made that exact point: "The Rule does not prohibit a lawyer from giving unsolicited legal advice; it proscribes the acceptance of employment resulting from such advice." *Ohralik,* 436 U.S. at 458, 98 S.Ct. 1912. In other words, no expressive speech is being restricted and no viewpoint suppressed.

**11.** In his testimony before the Council advocating enactment of the proposed legislation, see pp. 1212–13, *supra,* the representative of the Trial Lawyers Association noted that in *Went For It,* the Supreme Court upheld a prohibition against solicitation by "the *far less intrusive mechanism of direct mail.*" (Emphasis added.)

sions." *Ohralik,* 436 U.S. at 460, 98 S.Ct. 1912.

### (2) *The advancement of the District's interest*

We have no doubt that the Act, even more than the Florida regulation at issue in *Went For It,*[12] substantially advances the legitimate state interest in protecting the privacy and tranquility of accident victims and their families. In *Went For It,* the Supreme Court upheld Florida's thirty-day prohibition on direct-mail solicitation of accident victims—a far more extensive restriction than that imposed by the Act. The Court relied on various kinds of evidence, including anecdotal reports, newspaper articles, and complaints from potential clients who had received unwanted solicitations. *Id.* at 626–27, 115 S.Ct. 2371. In this case, as in *Went For It,* the record includes articles in the media, as well as testimony from representatives of the Bar Association of the District of Columbia, the Trial Lawyers Association, and the United States Attorney's Office, regarding the mischief caused by uninvited in-person solicitation. It also contains reports from individuals describing the intrusion upon their privacy which resulted from the practices sought to be prohibited. Moreover, the Court stated in *Went For It* that "we have permitted litigants to justify [commercial] speech restrictions by reference to studies and anecdotes pertaining to different locales altogether[.]" *Id.* at 628, 115 S.Ct. 2371. Accordingly, Florida's experience and that of other jurisdictions may also be considered in assessing the constitutionality of the District's legislation. We are therefore satisfied that the legislative record regarding the effects of in-person solicitation conducted a short time after a motor vehicle accident readily satisfies the "substantial interest" prong of the *Central Hudson* standard.

### (3) *The scope of the Act*

Following its earlier decision in *Central Hudson,* the Supreme Court recognized in *Went For It* that a regulation limiting commercial speech must be "narrowly drawn" to focus upon the substantial interest sought to be served. 515 U.S. at 624, 115 S.Ct. 2371. The Court explained, however, that the phrase "narrowly drawn" does not require the legislature to select the "least restrictive means" available. Indeed, the Court stated, "the least restrictive means test has no role in the commercial speech context." *Id.* at 632, 115 S.Ct. 2371 (citation and internal quotation marks omitted). Rather, it is sufficient if the restriction is "in proportion to the interest served."[13] *Id.* We believe that the Act satisfies the requirement of proportionality.

The statute challenged here does not *prohibit* personal solicitation, or even *immediate* personal solicitation. On the contrary, like the more extensive regulation upheld in *Went For It,* it imposes only a brief time restriction regarding when and how such solicitation may be carried out. It applies only to the in-person solicitation of business from a limited, and identifiable group of citizens, namely, accident victims

---

12. An accident victim can simply throw an unwanted mail solicitation into the waste paper basket (or, preferably, into a recycling receptacle). Moreover, the mail arrives in the daytime, usually only once a day. It is more difficult to dispose of or deal with an uninvited personal solicitation or of a series of unwanted and aggressive telephone calls, often late at night or in the early morning hours, especially in the immediate aftermath of an upsetting accident.

13. We have stated in a different context that "[p]roportionality is of consummate importance in judicious adjudication." *Allen v. United States,* 603 A.2d 1219, 1227 (D.C.1992) (en banc).

and their families. The Act targets and proscribes the precise source of the kinds of problems described in the legislative record—intrusive personal solicitation by practitioners, or their agents or runners, in the immediate aftermath of an accident. The Act can therefore fairly be described as "narrowly drawn," and it deals only with the specific harm sought to be addressed.

In *Went For It*, the Court explicitly held that the "brief 30–day period" prohibiting direct-mail solicitation of accident victims is "reasonably well tailored to its stated objective." *Id.* at 633, 115 S.Ct. 2371. The Court's reasoning applies *a fortiori* to this case, for the Act prohibits only in-person solicitation (but not direct-mail contact),[14] and the prohibition is for only twenty-one days, a briefer period than was at issue in *Went For It.* The Act thus constitutes a reasonable means to achieve the legitimate objectives of the Council.[15]

## B. *Speech and Verbal Conduct*

■ Bergman contends, however, that the Act is aimed at the content of an attorney's speech (*i.e.,* his or her encouragement of potential clients not to settle their cases immediately without legal counsel) and that it discriminates on the basis of the speaker's viewpoint. We do not agree.

■ "The principal inquiry in determining content neutrality … is whether the government has adopted a regulation of speech because of a disagreement with the message it conveys." *Hill v. Colorado,* 530 U.S. 703, 719, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). The "threshold consideration" is the purpose of the restriction. *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 763, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). In the present case, the stated (and obvious) purpose of the Act was to prevent the intrusive solicitation and harassment, often by numerous practitioners or their runners or agents, of individuals who had very recently been involved in automobile accidents, and who were likely to be in vulnerable circumstances. The Act was not aimed at chilling the exercise by accident victims of their right to seek legal redress, and it does not inhibit such exercise.

The Council could reasonably conclude that restrictions of in-person solicitation by practitioners were needed more urgently, and should be more severe, than restrictions on insurers and their agents. This is so because, in the absence of legislative protection, the victim of an accident might well be subjected to unwelcome and

---

**14.** The dissenting justices in *Went For It*, who would have struck down the Florida regulation, also recognized the difference between solicitation by mail, which they viewed as constitutionally protected, and "direct, in-person solicitation," which, as the Court had held in *Ohralik*, is not to be accorded First Amendment protection. *Went For It*, 515 U.S. at 637–38, 115 S.Ct. 2371.

**15.** Several United States Courts of Appeals have upheld the constitutionality of laws similar to the Act as against First Amendment challenges, relying in each case on the authority of *Central Hudson, Ohralik,* and *Went For It. See, e.g., Capobianco v. Summers,* 377 F.3d 559, 562, 564–65 (6th Cir.2004) (affirming trial court's rejection of First Amendment challenge to Tennessee regulation barring chiropractors from soliciting the business of accident victims within thirty days of an accident; the court so held notwithstanding plaintiffs' claim that regulation denied them equal protection because it did not apply to medical doctors); *Falanga v. State Bar of Georgia,* 150 F.3d 1333, 1344–45 (11th Cir. 1998) (upholding, as consistent with First Amendment, a rule prohibiting attorneys or their agents from in-person, uninvited solicitation of unsophisticated, injured, or distressed lay persons).

intrusive contacts from a dozen or more personal injury attorneys, or from persons working on these attorneys' behalf. In most or all instances, on the other hand, only the insurers of the persons involved in the accident—ordinarily two at the most—would have any reason to initiate uninvited contact with the victim. It is difficult to imagine such a victim receiving unwelcome visitors, or intrusive telephone solicitation, from a large number of insurance representatives, in the early hours of the morning or late at night (or at all times in between) in the immediate aftermath of an automobile accident. The record of solicitation of accident victims by multiple practitioners, see Part I, *supra*, therefore provides persuasive justification for this difference in legislative treatment. The Council was not obliged to accord to practices which constitute a major intrusion on victims' privacy treatment identical to that provided to practices that create a less serious problem. *Cf. Capobianco*, 377 F.3d at 564–65 (regulation of solicitation by chiropractors but not by medical doctors sustained against equal protection challenge, where there was no evidence that medical doctors engaged in solicitation).

■ The District may, without violating the First Amendment, regulate *conduct* that accompanies speech, without regard to the *content* of the speech. *R.A.V.*, 505 U.S. at 385, 112 S.Ct. 2538. Speech may not be proscribed because of the ideas it expresses, but it may be restricted because of the manner in which it is communicated or the action that it entails. *Id.* The Court recognized in *R.A.V.*, for example, that the legislature has "the power to proscribe particular speech on the basis of a noncontent element (*e.g.*, noise)." *Id.* To be sure, speech may not be denied full First Amendment protection because its "content communicates any particular idea." *Id.* at 393, 112 S.Ct. 2538. Speech may be restricted, however, when it "embodies a particular intolerable (and socially unnecessary) *mode* of expressing *whatever* idea the speaker wishes to convey." *Id.* (emphasis in original).

The Act was not aimed at the "content" of a practitioner's speech, but at the offensive behavior that often accompanies its delivery. Legislation aimed at intrusive and exploitive practices cannot reasonably be viewed as siding with insurance companies, or as seeking to inhibit the exercise by accident victims of their right to counsel. The Act does not "disapprove" any message. As the trial judge concluded, "[t]he restriction in the Act is not directed at the legal advice the plaintiff might be seeking to provide to a potential client in the immediate aftermath of a motor vehicle accident, but rather to the nature of the solicitation itself of the client for remuneration."

## C. Viewpoint Discrimination

■ Bergman contends that the Act does not subject insurance agents, adjusters, and attorneys for prospective defendants to the same restrictions as it imposes on practitioners, and that under the Act, the limitation of speech depends on whether the speaker advocates early and uncounseled settlement (which, according to Bergman, is accorded favorable treatment by the Act) or litigation (which, Bergman suggests, the Act disfavors). Bergman argues that this allegedly disparate treatment constitutes "viewpoint discrimination," and that his claim is not foreclosed by the Supreme Court's rejection of First Amendment challenges in *Ohralik* and *Went For It* because, according to Bergman, these decisions did not address the point. We do not agree.

In *Ohralik*, the Court held that the "State ... constitutionally may discipline a

lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent." 436 U.S. at 449, 98 S.Ct. 1912. The Court explained that

> in-person solicitation of professional employment by a lawyer does not stand on a par with truthful advertising about the availability and terms of routine legal services, let alone with forms of speech more traditionally within the concern of the First Amendment. . . . To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution . . . of the Amendment's guarantee with respect to the latter kind of speech.

*Id.* at 455–56, 98 S.Ct. 1912. "The State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Id.* at 456, 98 S.Ct. 1912. "While this does not remove the speech from the protection of the First Amendment . . . it lowers the level of appropriate judicial scrutiny." *Id.* As the trial judge in this case noted in her opinion, the Supreme Court explained in *Ohralik*, 436 U.S. at 457, 98 S.Ct. 1912, that "[i]n-person solicitation by a lawyer of remunerative employment is a business transaction in which speech is an essential but subordinate component."

Bergman argues that the Court's holding in *Ohralik* was based on a perceived presumption of "even-handed enforcement" as between practitioners and insurers. In so claiming, Bergman attributes to the Court a view that the Court did not express or hold. To be sure, the Court observed, in a footnote, that while "recognizing the importance of the State's interest in regulating solicitation of paying clients by lawyers, we are not unmindful of the problem of the related practice . . . of the solicitation of releases of liability by

claims agents or adjusters of prospective defendants or their insurers." *Id.* at 459 n. 16, 98 S.Ct. 1912. But recognizing the existence of this problem did not negate the Court's basic holding. Indeed, the Court was fully aware, when it upheld, against a First Amendment challenge, a ban on in-person solicitation by lawyers, that the prohibition which it sustained did not apply to the practices of insurers or their representatives. There is nothing in the Court's opinion in *Ohralik* which suggests that the outcome of that case is dependent on the extent of regulation by the state of the practices of insurance agents or adjusters, or of attorneys for prospective defendants.

Bergman also asserts that *Went For It* is distinguishable because, according to him, no claim of viewpoint discrimination was raised in that case. Once again, we do not agree. In *Went For It,* as we have seen, the Supreme Court held that a Florida Bar rule prohibiting personal injury lawyers from sending targeted direct-mail solicitations to victims and their relatives for thirty days following an accident did not violate the First or Fourteenth Amendments. 515 U.S. at 620, 115 S.Ct. 2371. The Court explicitly recognized that the rule which it sustained as constitutional "may prevent citizens from learning about their legal options, *particularly at a time when other actors—opposing counsel and insurance adjusters—may be clamoring for the victim's attention.*" *Id.* at 633, 115 S.Ct. 2371 (emphasis added). The Court declined, however, to invalidate the Florida rule on the basis of these concerns, noting that the rule imposed only a limited restriction on the practices of personal injury lawyers and that there were many other ways in which accident victims could learn of the availability of legal representation, including advertising in the media, in

the Yellow Pages, and in other directories. *Id.* at 633–34, 115 S.Ct. 2371.[16]

The opinions in *Ohralik* and *Went For It* establish beyond peradventure that in both cases, the Supreme Court recognized the concerns which Bergman has expressed here, but rejected the notion that real or perceived regulatory inequality as between practitioners and insurers nullifies the authority of the state to restrict intrusive personal solicitation by practitioners and their agents, even where, as in *Went For It*, the proscribed solicitation was less intrusive than the practices at issue here. The Act, as we have noted, renders any release of liability executed within twenty-one days of an accident, without the benefit of legal counsel, voidable within fourteen days, and it requires that a release contain a conspicuous and separately stated notice of the releasing party's right to rescind. D.C.Code § 22–3225.14(d). In our view, this provision provides reasonable and constitutionally adequate protection to consumers from overreaching by insurers and their agents.

Although articulated differently, Bergman's claim of "viewpoint discrimination" is similar in principle to the unsuccessful argument in *Capobianco,* to the effect that a prohibition against solicitation which applied to chiropractors but not to medical doctors denied chiropractors the equal protection of the law. Presumably, a chiropractor who solicits a patient's business "advocates" that the patient be treated by a chiropractor, whereas a hypothetical doctor who engages in such activity "advocates" medical treatment. Nevertheless, the court in *Capobianco* sustained the challenged regulation because there was evidence that chiropractors engaged in solicitation, to the detriment of prospective patients, while there was no comparable record of objectionable solicitation by med-

ical doctors. *Capobianco,* 377 F.3d at 564–65. Bergman's claim in this case likewise fails, in part for a similar reason. The intrusive conduct that has caused the harm at which the Act is aimed is that of practitioners and their agents and runners, and it is the intrusion, and not the "message," at which the Act is aimed.

 Bergman argues, and we agree, that "[v]iewpoint discrimination is . . . an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *see also Legal Servs. Corp. v. Velazquez,* 531 U.S. 533, 541–42, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). But read as a whole, the Act is demonstrably aimed at unwanted and intrusive in-person contacts, rather than at any "specific motivating ideology" or particular viewpoint. This is evident from what is permitted and what is forbidden. The Council restricted in-person solicitation by practitioners who do not have preexisting relationships with victims of accidents, but the Act permits persons who do have such relationships—whether they are insurers or their agents or practitioners who represent victims—to initiate such contacts. D.C.Code § 22–3225.14(a)(1) & (2). The obvious justification for this distinction is that a communication from a person with whom the victim has a prior relationship is less likely to be harassing, exploitive, or intrusive than an unsolicited contact from someone whom the victim does not know. Thus, because the Act is directed at intrusive practices, and not at any viewpoint, the Council's different treatment of different problems

---

**16.** Today, the Internet is also widely avail- able.

does not render it invalid. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Rock Against Racism*, 491 U.S. at 791, 109 S.Ct. 2746. Moreover, as we have noted, the demonstrated need for protection from uninvited visits or telephone calls by numerous practitioners and their agents substantially outweighs any perceived necessity for restricting unwanted contacts initiated in a given case by, at most, one or two insurers.

In *R.A.V.*, on which Bergman relies, the Court held that a St. Paul, Minnesota ordinance which prohibited the display of any symbol which "arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender" violated the First Amendment. 505 U.S. at 380, 112 S.Ct. 2538. The Court reasoned that by linking the offensive display or symbol to the five enumerated categories, St. Paul had imposed "special prohibitions on those speakers who express views on disfavored subjects." *Id.* at 391, 112 S.ct. 2538. Moreover, the Court concluded, unsurprisingly, that the primary effect of the ordinance was to regulate speech. *Id.* at 394, 112 S.Ct. 2538. But the Court also reiterated that commercial speech receives less protection than political speech,[17] noting that a "State may choose to regulate price

advertising in one industry but not in others, because the risk of fraud (one of the characteristics of commercial speech that justifies depriving it of full First Amendment protection) is in its view greater." *Id.* at 388, 112 S.Ct. 2538. In *Went For It,* decided three years after *R.A.V.*, the Court upheld, against a First Amendment challenge, a Florida regulation, similar to, though more restrictive than, the Act,—a result that the Court could not have reached if the decision in *R.A.V.* compelled the conclusion that in-person solicitation of accident victims constitutes activity protected by the First Amendment. 515 U.S. at 620, 115 S.Ct. 2371.[18]

Complaining of the Act's restriction on practitioners' access to police reports unless they agree to abide by the twenty-one-day restriction on some in-person solicitation, Bergman argues that "the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). We agree without reservation with the principle articulated in *Cornelius,* but we do not believe that it has any bearing on this case. The Act was not designed "solely," or even partially, to suppress a viewpoint that Bergman espouses. Rather, it protects

---

**17.** Significantly for present purposes, the Court cited *Ohralik* in support of this proposition.

**18.** In *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), the Court, in invalidating a blanket ban on advertising the retail price of alcoholic beverages, differentiated that case from *Went For It,* in which, as the Court pointed out, it had upheld "a 30–day prohibition against a certain form of legal solicitation largely because it left so many channels of communication open to Florida lawyers." *Id.* at 501–02, 116 S.Ct. 1495. In this case, attorneys in the

District of Columbia have even more channels of communication open to them under the Act than their Florida counterparts had in *Went For It.* In any event, the issues in the present appeal—which involves a limited proscription against uninvited efforts to enter into a commercial transaction with a prospective client—are far closer to the issues presented in *Ohralik* and *Went For It* than they are to those in *44 Liquormart* or in *Greater New Orleans Broadcasting Ass'n v. United States,* 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) (a decision on which Bergman also relies).

accident victims from intrusive conduct designed to induce them to enter into a commercial transaction with the practitioner who is engaging in the solicitation.

### D. *Limitation of Time for Unrepresented Clients to Revoke Releases or Settlements*

Bergman complains that the Act provides only fourteen days in which an accident victim may void a release executed during the twenty-one day period in which some in-person solicitation is prohibited. D.C.Code § 22–3225.14(d)(1). He implies that the Council created an illusory remedy for an unrepresented accident victim in order to disguise its true agenda of creating an unfair advantage for insurers and their agents. This suggestion is altogether unpersuasive. We agree with counsel for the Council Members who, relying on *Hornstein*, 560 A.2d at 533, argue that to lend any credence to the charge that the Council "engaged in Machiavellian tactics would turn on its head the mandate that the court presume the validity of the challenged law[19] and the good faith of the legislature in enacting it."

The reality is less sinister than Bergman suggests. Members of the Council, like the Supreme Court in *Ohralik* and *Went For It*, were aware that even a narrowly drawn proscription against in-person solicitation could lead some accident victims to enter into settlements, or to execute releases from liability, at a time when they were not represented by counsel and did not know their rights. It was for that reason that the Council included in the statute a provision permitting an unrepresented client to rescind such an agreement within fourteen days after executing it. Indeed, in conformity with an amendment proposed by Council Member Kwame Brown, the period was increased from seven business days, as originally proposed, to fourteen calendar days, because "[t]he number of days after signing a release without the benefit of legal counsel in which an injured party may exercise the voidability clause should be longer to ensure that the injured party has ample time to exercise that option."

In any event, the Act permits direct-mail solicitation by practitioners at any time, and it allows in-person solicitation by practitioners with whom the prospective client has a prior relationship. There is thus *no* period during which a practitioner is prevented from communicating with the victim of an accident victim. The victim's right to legal representation, if he or she ultimately chooses to employ counsel, is further protected by the requirement that any release "contain a notice of the claimant's right to rescind conspicuously and separately stated on the release." D.C.Code § 22–3225.14(d)(2). This is not the stuff of which a perverse hidden agenda to chill victims' exercise of their rights is made. The Council could have, and perhaps should have, given unrepresented victims the full twenty-one days to rescind uncounseled settlements or releases, but this is a question of legislative policy and the Council's decision should not be second-guessed by the judiciary.

In sum, we conclude that the Act is a reasonable exercise of the Council's police power, that it does not constitute viewpoint discrimination, and that it is consistent with the First Amendment.

### III.

### THE HOME RULE ACT

Bergman also contends that regulation of the conduct of attorneys practic-

---

19. But *cf.* note 7, *supra*.

ing in the District of Columbia is solely the province of the District of Columbia Court of Appeals, and that the HRA so provides. He argues that the Act impermissibly intrudes upon this court's exclusive authority to regulate the practice of law, and that it runs afoul of separation of powers principles. We do not agree.

■ Under the HRA, "[t]he judicial power of the District is vested in the District of Columbia Court of Appeals and the Superior Court of the District of Columbia." D.C.Code § 1–204.31(a) (2001). There is no dispute that this court, as the highest court of the District of Columbia, has the inherent authority to regulate the practice of law, including the admission and discipline of attorneys. "The great weight of authority renders it almost universally accepted that the highest court in the jurisdiction is imbued with the inherent authority to define, regulate, and control the practice of law in that jurisdiction." *Brookens v. Committee on Unauthorized Practice of Law*, 538 A.2d 1120, 1125 (D.C.1988); *see also Ex parte Burr*, 9 Wheat. 529, 22 U.S. 529, 530–31, 6 L.Ed. 152 (1824); *Sitcov v. District of Columbia Bar*, 885 A.2d 289, 295 (D.C. 2005). The inherent authority of the judicial branch to discipline attorneys gives the court the "primary" power to do so. *Obrien v. Jones*, 23 Cal.4th 40, 96 Cal. Rptr.2d 205, 999 P.2d 95, 100 (2000). The existence of this "primary" power does not necessarily mean, however, that the legislature is precluded from playing any role in the regulation of the conduct of attorneys and of the practice of law. *Id.; see also In re Bozarth*, 178 Okla. 427, 63 P.2d 726, 728–29 (1936), and authorities there cited.

As correctly noted by the trial judge, the issue presented here is whether, in the District of Columbia, this court's authority to regulate the legal profession is not only inherent, but also exclusive. Specifically, we must decide whether the Council is prohibited from exercising its police power to address matters (such as the protection of residents of the District from intrusive conduct and harassment by practitioners) that would otherwise indisputably be within its legislative purview, when the legislation in question also restricts the professional conduct, *inter alia*, of attorneys.

In support of his theory that this court's authority over the conduct of attorneys is exclusive, Bergman cites a provision in Title VI of the HRA, D.C.Code § 1–206.02(a)(4), which states that the Council shall have no authority to "[e]nact any act, resolution, or rule with respect to any provision to Title 11 [of the D.C.Code] (relating to organization and jurisdiction of the District of Columbia courts)."[20] On its face, the Act does not affect the organization or jurisdiction either of this court or of the Superior Court. The HRA further provides that "[t]he District of Columbia Court of Appeals shall make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their

---

**20.** Title VI of the HRA, of which § 1–206.02 is a part, is headed "Reservation of Congressional Authority." The authority of Congress to legislate for the District of Columbia is set forth in Article I of the Constitution. In the HRA, Congress broadly delegated legislative authority to the Council, but Congress also reserved to itself the right to enact legislation for the District of Columbia on any subject, notwithstanding that delegation.

This case, however, does not present any issue as to which body—Congress or the Council of the District of Columbia—is authorized to legislate on a particular subject. *Cf. In re Prosecution of Crawley*, 978 A.2d 608, 620 (D.C.2009) (holding that the Council has no authority to legislate with respect to the powers of the United States Attorney). The issue here is whether the Council, in passing the Act, intruded upon the *judicial* role.

censure, suspension, and exclusion." D.C.Code § 11–2501(a). By its terms, that provision simply confirms the existence of this court's inherent authority over admission and discipline of attorneys. Bergman in effect asks us, however, to read § 11–2501(a) and § 1–206.02(a)(4) together in such a way that the whole exceeds the sum of its parts. According to Bergman, these two provisions, in combination, confer upon this court the *exclusive* authority to take any action which would restrict in any way the conduct of attorneys in the practice of law.

The trial judge discerned no basis in the HRA for the proposition that this court's authority is not only inherent but also exclusive. She noted that D.C.Code § 1–206.02(a)(4) precludes the Council from amending the fundamental organization and jurisdiction of the District of Columbia courts, which were established by Congress in 1970.[21] But this court and the United States Court of Appeals for the District of Columbia Circuit have consistently held, and the trial judge reiterated in her opinion in this case, that restrictions on the legislative authority of the Council in § 1–206.02(a)(4) must be narrowly construed, so as not to thwart the paramount purpose the HRA, namely, to "grant to the inhabitants of the District of Columbia powers of local self-government." D.C.Code § 1–201.02(a) (2008). *See, e.g., District of Columbia v. Sullivan*, 436 A.2d 364, 366 (D.C.1981) (holding that the Council has the authority to provide for the administrative adjudication of certain traffic offenses); *Dimond v. District of Columbia*, 253 U.S.App. D.C. 111, 120–22, 792 F.2d 179, 189–90 (1986) (holding that the Council's limitation on the right to

bring a tort action for certain non-economic losses was not an impermissible alteration of the jurisdiction of the Superior Court).

Although the text of the provisions cited by Bergman provides scant support for his position, he bases his argument in substantial part on certain language appearing in two of our cases, *Banks II*, 634 A.2d 433, and *Banks III*, 805 A.2d 990. The language on which Bergman relies suggests that this court's authority to regulate the practice of law in the District of Columbia is exclusive as well as inherent. According to Bergman, these decisions preclude enactment of any legislative restriction on the solicitation of clients by attorneys. Although each of these opinions contains inaccurate dictum which, when read in isolation, ostensibly lends some support to Bergman's position, neither case presented any issue relating to the supposed exclusivity of this court's authority over members of the Bar. Indeed, Simon Banks, the appellant in all of the *Banks* cases, was not a lawyer at all.

In *Banks II*, Banks argued that the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") exceeded its statutory authority by holding that he had committed unfair trade practices, in violation of the Consumer Protection Procedures Act ("CPPA"), D.C.Code § 28–3904. 634 A.2d at 436. Banks had graduated from law school, but he was never admitted to the Bar. *Id.* at 435. In *In re Banks*, 561 A.2d 158, 167 (D.C.1987) (*Banks I* ), this court had previously held that Banks had engaged in the unauthorized practice of law, and Banks was enjoined from practicing law or hold-

---

**21.** Sections 11–2501 and –2502 were enacted as part of the Court Reform and Criminal Procedure Act of 1970, and they took effect on April 1, 1972. Prior to that time, disciplinary authority over members of the Bar was vested in the United States District Court for the District of Columbia. *See Sitcov*, 885 A.2d at 295 n. 7; *In re Keiler*, 380 A.2d 119, 124 (D.C.1977).

ing himself out to the public as someone authorized to practice law in the District. That injunction precluded him from representing that he was a "lawyer," or "attorney," "counsel," "advocate," "administrative advocate," "administrative law judge," or "administrative trial advocate." *Id.* at 168.

Apparently undaunted, Banks attempted to circumvent the decision in *Banks I.* Two years after the injunction was entered, the DCRA initiated an administrative proceeding against Banks for unfair trade practices, alleging that Banks had described himself to a client in an employment discrimination case as an "administrative advocate." *Banks II,* 634 A.2d at 435. Banks argued that only this court had jurisdiction over issues concerning the unauthorized practice of law. *Id.* at 436. We held in *Banks II* that although this court has the authority to take action against such unauthorized practice, our authority to do so is not exclusive. *Id.* at 437. We concluded that the DCRA was not precluded from proceeding against non-lawyers who were accused of deceptive or unfair trade practices by misrepresenting themselves as being attorneys. *Id.* The professional services of attorneys are exempted from the CPPA, D.C.Code § 28–3903(c)(2)(c), but we held that Banks, as a non-lawyer, could not rely on that exclusion. *Id.* The fact that the unfair trade practice in which Banks had allegedly engaged consisted of pretending to be an attorney did not affect the DCRA's jurisdiction over his case. *Id.*

In *Banks II,* this court distinguished Banks' situation from that of a member of the Bar, and a sentence in our opinion in *Banks II,* subsequently reiterated in *Banks III,* forms the primary basis for Bergman's argument that the Act conflicts with the HRA. Specifically, we stated in *Banks II* that this court "has the 'inherent *and exclusive* authority to define and regulate the practice of law in the District of Columbia.'" 634 A.2d at 436 (citing *Brookens,* 538 A.2d at 1125) (emphasis added). Bergman asserts that the reference in *Banks II* to this court's supposedly exclusive authority to regulate the practice of law was a part of our holding, and therefore not dictum, even though the case concerned a non-lawyer. He so claims because this court distinguished its "exclusive" authority over lawyers from its authority over the unauthorized practice of law, which is not exclusive, and he contends that the articulation of this distinction was a part of our holding. The trial judge in the present case rejected this argument, stating that it "proves too much." We agree with the trial judge.

The issue in *Banks II* was whether the CPPA applied to Banks' activities when he was purporting to practice law. We rejected Banks' circular argument that his unauthorized practice of law shielded him from liability under the CPPA, based on the statutory exemption for professional activities of attorneys. 634 A.2d at 437. Had he been an attorney, then the CPPA indisputably would not have applied to him. The applicability of the CPPA to Banks did not turn on the nature of this court's regulatory power over the professional conduct of members of our Bar. Indeed, the case had nothing at all to do with that issue.

Further, the description in *Banks II* of this court's authority as exclusive was based on a misconception of what the court in *Brookens* had decided and said. The language in *Brookens* about exclusivity was a summary of the argument advanced by the Committee on Unauthorized Practice of Law to this court in that case, and it

was *not* a part of the ruling of the court.[22] *Brookens,* 538 A.2d at 1125. *Brookens* involved a challenge to a contempt citation against an attorney who was not a member of the District Bar, based on his unauthorized practice of law in the District. *Id.* at 1121–22. Some of Brookens' activities involved the representation of clients in court, but he had also appeared on behalf of clients before the District of Columbia Rental Accommodations Office. *Id.* at 1121. The rules of that Office permitted lay representation. *Id.* at 1125. This court affirmed the trial judge's contempt adjudication without resolving the question of whether an administrative agency's adoption of regulations permitting lay representation was in conflict with our "inherent power to define and regulate the practice of law." *Id.* at 1127. The opinion in *Brookens* described this court's authority as "inherent," but did not characterize it as "exclusive." *Id.*

*Banks III* concerned civil and criminal contempt proceedings arising out of enforcement of the injunction that had been entered in *Banks I.* 805 A.2d at 993–97. In that case, this court repeated the inaccurate dictum from *Banks II,* purportedly based on *Brookens,* regarding this court's supposedly exclusive authority to define and regulate the practice of law in the District of Columbia. 805 A.2d at 997. Like *Banks II,* however, *Banks III* had nothing at all to do with the issue before us here, namely whether the legislative branch, in the exercise of its police power, is precluded by the HRA from enacting an otherwise valid statute which restricts, *inter alia,* certain practices by members of the Bar.

Bergman also cites *Kennedy v. Educational Testing Serv., Inc.,* 393 A.2d 523 (D.C.1978), but that decision provides him with no solace. In *Kennedy,* we held that this court—and not the Superior Court—had subject matter jurisdiction over a complaint relating to the multistate bar examination and, in particular, over the refusal of the Educational Testing Service ("ETS") to permit review of the scoring of that examination. *Id.* at 524–25. We reasoned that with regard to the multistate examination, ETS was functioning as an agent of the Committee on Admissions of the District of Columbia Court of Appeals. *Id.* at 525. The only purpose of the re-

---

**22.** For the reader's convenience, we detail in this footnote the error made in *Banks II* and repeated in *Banks III*. In *Banks II*, the passage purporting to rely on *Brookens* reads as follows:

> "This court has the 'inherent and exclusive authority to define and regulate the practice of law in the District of Columbia.'" *Brookens v. Committee on Unauthorized Practice of Law*, 538 A.2d 1120, 1125 (D.C.1988); *see* D.C.Code § 11–2501 *et seq.* (1989).

*Banks II*, 634 A.2d at 436. This inaccurate reference to *Brookens* was repeated in *Banks III*, relying on *Banks II*:

> "This court has the 'inherent and exclusive authority to define and regulate the practice of law in the District of Columbia.'" *Banks II*, 634 A.2d at 436 (quoting *Brookens v. Committee on Unauthorized Practice of Law*, 538 A.2d 1120, 1125 (D.C.1988), and citing D.C.Code § 11–2501 *et seq.*).

805 A.2d at 997.

The language that actually appeared in *Brookens* was as follows:

> Second, *the Committee [on Unauthorized Practice] argues that this court, pursuant to D.C.Code § 11–2501(a) (1981), has the inherent and exclusive authority to define and regulate the practice of law in the District of Columbia.* The Committee asks us to find that our statutory authority to promulgate rules with respect to the practice of law in the District, D.C.Code § 11–2501, supersedes a local agency's statutory authority to adopt procedures governing the qualifications of those persons who represent parties in proceeding before the agency. D.C.Code § 1–1503 (1981).

538 A.2d at 1125. (Emphasis added) (footnote omitted).

quested disclosure, as Kennedy himself acknowledged, concerned the decision of the Committee on Admissions not to certify Kennedy to the Court of Appeals for admission to the Bar—a function which is indisputably within this court's exclusive authority. *See* D.C.Code § 11–2501. No issue under the HRA was raised.[23]

 Bergman further invokes separation of powers principles in support of his claim that the Council has violated the HRA. On its face, however, the Act is an exercise of the Council's police power to enact legislation for the protection of residents of the District of Columbia from intrusive and exploitive practices. It does not affect the organization or jurisdiction of the District of Columbia courts, nor does it interfere with this court's authority over Bar admission or attorney discipline. Moreover,

> [s]imply because certain conduct is subject to professional discipline is no reason why the legislature may not proscribe the conduct. Under the police power the legislature may enact penal legislation that affects the legal profession just as it can with regard to other occupations and professions.

*Pace v. State of Florida,* 368 So.2d 340, 345 (Fla.1979).

Nevertheless, Bergman contended in the trial court, and reiterates on appeal, that the Act directly conflicts with, and effectively reverses, a policy judgment made by this court promulgating Rule 7.1 of the Rules of Professional Conduct. Rule 7.1 does not impose a specific time restriction on in-person solicitation by lawyers of potential clients, but it does preclude a lawyer from engaging in in-person solicitation that involves the "use of undue influence," and it prohibits such solicitation if the "potential client is apparently in a physical or mental condition which would make it unlikely that the potential client could exercise reasonable, considered judgment as to the selection of a lawyer." *See* Rule 7.1(b)(2) & (3) of the Rules of Professional Conduct. The Rule also prohibits use of an intermediary to solicit clients in certain circumstances involving "the use coercion, duress, compulsion, intimidation, threats, or vexatious or harassing conduct." Rule 7.1(b)(5).

The trial judge recognized that the intrusive conduct on the part of attorneys which is addressed by Rule 7.1 was also a primary focus of the Council in its consideration and eventual passage of the Act. Nevertheless, she concluded that this court's inherent and statutory authority to regulate the practice of law in the District of Columbia is not "exclusive"

> in the sense that it would preclude the Council from enacting legislation pursuant to its police powers that might also affect the conduct of lawyers in some respect. Even if there is an overlap between the authority of the Court of Appeals to regulate the practice of law by members of the District of Columbia Bar and the authority of the Council to enact legislation to protect against inva-

---

**23.** *See also Sitcov,* 885 A.2d at 295, in which we held that this court's authority over the practice of law in the District of Columbia included original jurisdiction to review a decision by the Board of Governors of the District of Columbia Bar—an "arm of the court"—to suspend a member of the Bar for non-payment of Bar dues, and to reinstate that lawyer prospectively upon payment of the delinquent dues and associated penalties. In *Sitcov,* we referred to Section 11–2501 and to this court's "inherent authority" to regulate the practice of law in this jurisdiction, *id.* at 297 (citing *Brookens,* 538 A.2d at 1125), but we said nothing suggesting that this power was exclusive or that the subject was "off limits" to the legislature. As in *Kennedy,* this court made no mention in *Sitcov* of the powers of the Council under the HRA.

sions of privacy and harassment of accident victims and consumers in the District of Columbia, those overlapping powers only constitute a violation of separation of powers if the intruding branch "impermissibly undermines the powers" of the other branch or "disrupts the proper balance between the coordinate branches by preventing the [allegedly intruded on] branch from accomplishing its constitutionally assigned functions." *Hessey v. Burden,* 584 A.2d 1, 5 (D.C. 1990) (internal citations omitted); *see also Morrison v. Olson,* 487 U.S. 654, 693–94, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988).

(Some internal quotation marks omitted). We agree with the trial judge.

In our view, the Council's passage of the Act, in the exercise of its power to enact legislation of general applicability, does not impermissibly burden or unduly interfere with this court's authority to exercise its core functions relating to Bar admission and the discipline of attorneys. *See Hessey,* 584 A.2d at 6. With the exceptions previously mentioned, the Act does preclude practitioners, including (but not limited to) attorneys, from in-person solicitation of accident victims for twenty-one days, and the Rules of Professional Conduct do not include such an absolute time-bound restriction. But the trial judge held, and again we agree, that the Council's enactment of this

> [n]arrowly drawn anti-fraud criminal and consumer protection statute intend-

ed to protect against harassment of motor vehicle accident victims, and the invasion of their privacy, in the immediate aftermath of an accident, does not unduly burden the Court of Appeals in the exercise of its core functions. To the contrary, it does not appear that the Act limits the authority or ability of the Court of Appeals to carry out its functions with regard to Bar admission, attorney discipline or the regulation of the practice of law in the District of Columbia in any significant way. The Act therefore does not violate the separation of powers doctrine.[24]

Especially in the absence of textual or other persuasive support for Bergman's proposed construction of the HRA well beyond its express terms, we believe that it would be an inappropriate exercise of judicial power to restrict the legislative authority of our elected representatives in the manner that Bergman suggests.

## IV.

## CONCLUSION

For the foregoing reasons, the judgment is

*Affirmed.*

---

**24.** In a footnote, the trial judge also warned of the potential consequences of the lack of any reasonable limiting principle to Bergman's position:

> The logical extension of the plaintiff's argument is that the Council could not legislate on any subject affecting the public welfare, if that conduct related to the practice of law by lawyers. Such an interpretation would

preclude prosecution of a lawyer for failing to pay taxes on income derived from his or her law practice, or, as the Council defendants note, for theft or client funds. It also goes against the long-standing principle, discussed above, that restrictions on the Council's legislative authority are to be narrowly construed.