Jay HESSEY, Appellant,

v.

Valerie K. BURDEN,

and

District of Columbia Board of Elections and Ethics, Appellees,

James Durham, Kenneth Price, The Apartment and Office Building Association of Washington, D.C.,

and

The Washington, D.C. Association of Realtors, Inc., Intervenors.

No. 90–679.

District of Columbia Court of Appeals.

Argued Sept. 13, 1990.
Decided Nov. 8, 1990.

Katherine A. Meyer, with whom Carol R. Golubock, Washington, D.C., was on the brief, for appellant.

William H. Lewis, with whom Alice P. McCrory, Washington, D.C., was on the brief, for appellee District of Columbia Bd. of Elections and Ethics.

Vincent Mark J. Policy, Washington, D.C., for intervenor-appellees James Durham, Kenneth Price, the Apartment and Office Building Ass'n of Washington, D.C., and the Washington, D.C. Ass'n of Realtors, Inc.

Before ROGERS, Chief Judge, and BELSON and FARRELL, Associate Judges.

FARRELL, Associate Judge:

D.C.Code § 1–1320(b)(1) (1987) provides that upon receipt of a proposed initiative for submission to the electors, the District of Columbia Board of Elections and Ethics (the Board) "shall refuse to accept the measure if the Board finds that it is not a proper subject of initiative ... under the

terms of title IV of the District of Columbia Self–Government and Governmental Reorganization Act...." [1] In this case the Board refused to accept a proposed initiative that, in relevant part, would create an Office of Public Advocate for Assessments and Taxation (OPA) with authority to appear and advocate "on behalf of the interest of the public and the taxpayers in general of the District" in administrative tax assessment proceedings before the Board of Equalization and Review (BER), and to appeal tax assessments by the Mayor to the Superior Court and this court, either on its own or by intervention in appeals by others.

The Board concluded that the proposed initiative violated title IV of the Home Rule Act in two respects. First, creation of the OPA with the specified powers would contravene the Mayor's authority under § 448(5) of title IV, D.C.Code § 47–310(a)(5) (1990), which provides that the Mayor shall "[s]upervise and be responsible for the assessment of all property subject to assessment and special assessments within the corporate limits of the District for taxation...." Second, investing the OPA with power to appeal assessments by the Mayor would expand the jurisdiction of the Tax Division of the Superior Court and of this court, in violation of § 602(a)(4) of title IV, D.C.Code § 1–233(a)(4); that section prohibits the Council of the District of Columbia—and thereby the electorate through the initiative [2]—from "enact[ing] any act, resolution, or rule with respect to any provision of title 11 of the District of Columbia Code (relating to organization and jurisdiction of the District of Columbia courts)." For both of these reasons, the Board determined that the proposed measure was not "a proper subject of initiative ... under the terms of title IV...." Appellant sought

relief in Superior Court, D.C.Code § 1–1320(b)(3), and that court sustained the Board's decision apparently on both grounds (the court issued no opinion).

Unpersuaded by either reason for refusing to place the initiative before the electorate, we reverse.

I.

As described above, the proposed initiative would create the OPA and invest it with, among other things, the authority:

To appear before or to intervene in proceedings before the Board of Equalization and Review, the Superior Court and the Court of Appeals on behalf of the interest of the public and the taxpayers in general of the District and to demand a hearing pursuant to section 47–825(e) and/or (i) or under any other provision of law in any matter or proceeding in which the public advocate may deem the public interest involved, including but not limited to proceedings with respect to:

(i) The valuation, assessment, or classification of any property, or

(ii) The appeal of an assessment of property and/or the tax pertaining thereto.

In rejecting the initiative on the basis of this provision,[3] the Board reasoned that the Mayor's authority under the Charter to "supervise or be responsible for" the assessment of property subject to taxation "cannot be exercised if a subordinate to the Mayor may institute litigation before the BER and the courts." Contrary to the Mayor's authority, "this proposed measure would require the Mayor to submit to the demands of the OPA (a subordinate) at the administrative level and permit that same subordinate to challenge the Mayor's final assessment in the courts." In the Board's

---

1. Pub.L. No. 93–198, 87 Stat. 774 (1973) (commonly known as the Home Rule Act). Title IV is entitled "The District Charter." The right of initiative was given the citizens of the District of Columbia by the Initiative, Referendum and Recall Charter Amendments Act of 1977, D.C.Code §§ 1–281 to –295.

2. "[A]bsent express or implied limitation, the power of the electorate to act by initiative is

coextensive with the power of the legislature to adopt legislative measures." *Convention Center Referendum Comm. v. District of Columbia Bd. of Elections & Ethics,* 441 A.2d 889, 897 (D.C. 1981) (en banc) (plurality opinion).

3. The Board did not find that other aspects of the initiative disqualified it under § 1–1320(b)(1).

view, "the functions contemplated by the OPA could be created, but only through the charter amending process.[4] Not even the Council [of the District of Columbia], under our system of government, would have the authority by legislation to superimpose the OPA function on the Mayor."

We hold that the trial court erred in agreeing with the Board that the measure impermissibly infringes on the Mayor's responsibility for assessment of taxable property. We are required to construe the right of initiative liberally, *Convention Center, supra* note 2, 441 A.2d at 913, and may impose on the right "only those limitations expressed in the law or 'clear[ly] and compelling[ly]' implied." *Id.* (quoting the "well-considered" opinion of the Texas Supreme Court in *Glass v. Smith,* 150 Tex. 632, 244 S.W.2d 645 (1951)); *see also id.* at 924 (Gallagher, J., dissenting) (the "charter grants of authority for the exercise of the initiative and referendum are to be liberally construed"; "[b]eing reservations of the power to the people, the court should strive to effectuate ... their purpose"). Examination of the proposed measure in relation to the Mayor's statutory responsibility for tax assessments leads us to conclude that the initiative would not contravene that authority.

Under existing law, the Mayor's powers in regard to taxation are broad but not unlimited. As stated earlier, the Charter directs the Mayor broadly to "supervise and be responsible for the assessment of all property subject to assessment and special assessments...." With respect to real property, this authority was given specific content by the District of Columbia Real Property Tax Revision Act of 1974[5] in which, as this court explained in *District of Columbia v. Catholic Univ. of America,* 397 A.2d 915, 919 (D.C.1979), "Congress placed broad powers of assessment, notifi-

cation, rate establishment and collection with the Mayor *and the Council*" (emphasis added). In keeping with the Charter, the Act provided that the Mayor "shall assess all real property ... and administer and collect the real property tax within the District." D.C.Code § 47–821(a).[6] Property assessments are to be made by assessors appointed by the Mayor, subject to "regulations concerning the assessment and reassessment of real property" adopted by the Council. §§ 47–821(b), –820(c). The assessed value of real property means "the estimated market value of such property" as determined by objective factors enumerated (non-exclusively) in § 47–820(a). The Act further established the BER, whose members are appointed by the Mayor with the advice and consent of the Council. § 47–825(a).

On or before March 1 of each year, the Mayor compiles the "preliminary assessment roll" containing a list of all real property and the estimated market value of each such property. § 47–823(a). After taxpayers are notified of the assessed value of their property, the preliminary assessment roll is submitted to the BER which, "[p]ursuant to applicable provisions of law, regulations adopted by the Council, or orders of the Mayor, ... shall attempt to assure that all real property is assessed at the estimated market value." § 47–825(f). Taxpayers may challenge proposed assessments before the BER, and "[b]ased on the record of complaints or of other information available to or solicited by the Board, the Board shall raise or lower the estimated market value of any real property" on specified conditions, "and shall revise the assessment roll accordingly." *Id.* The revised assessment is then presented to the Mayor, who "shall make such further revisions to the assessment roll as are required under other applicable

---

4. Section 303(a) of the Home Rule Act, D.C. Code § 1–205(a), provides that, with certain exceptions, "[t]he charter set forth in title IV ... may be amended by an act passed by the Council and ratified by a majority of the registered qualified electors of the District," subject to further approval by a concurrent resolution of the Congress.

5. Title IV of Pub.L. No. 93–407, 88 Stat. 1051, codified as amended at D.C.Code §§ 47–801 *et seq.* (1990).

6. The Mayor has delegated his responsibilities in this regard to the Department of Finance and Revenue, *see, e.g.,* 21 D.C.Reg. 2445 (1975).

4

provisions of law, and *shall approve* such assessment roll...." § 47–825(g) (emphasis added). The approved assessment roll "shall constitute the basis of assessment for the forthcoming fiscal year," subject to the right of "person[s] aggrieved by any assessment, classification, equalization, or valuation" to seek judicial review. §§ 47–825(g), (i).

From this description, it is evident that the Mayor's authority over tax assessments is broad but circumscribed. Through his or her delegate, the Mayor conducts the preliminary assessments in conformity with regulations adopted by the Council and the statutory definition of assessed value. The preliminary assessment roll is submitted to the BER which, again in keeping with applicable laws and regulations and guided by the basic aim "to assure that all real property is assessed at the estimated market value," prepares the revised assessment roll which the Mayor "shall approve," subject to further revisions required by law. The Board emphasized the BER's role as "an executive agency under the Mayor which, together with the Department of Finance and Revenue, assists the Mayor in the final determination of the assessment roll." While that is so, it is also apparent that the Mayor's authority is restrained by the semi-independent role of the BER in the assessment process, as well as by the Council's authority to regulate that process. And the outcome is subject to an aggrieved person's additional right of judicial review.

It is against this background that the proposed role of the OPA must be examined to decide whether it impermissibly limits the Mayor's authority. As appellant correctly points out, the OPA would have no role to play in the initial property assessment by the Mayor's delegate, and would have no authority to order an increase or decrease in the preliminary esti-

mate. That authority remains with the BER, subject to the Mayor's limited amendatory authority. Indeed, since all participants in the process are charged with the duty to assess property at the estimated market value, it is not unreasonable to view the OPA's proposed role before the agency as collaborating with the Mayor and the BER to achieve that common aim. Furthermore, as in the case of the BER itself, section 3 of the initiative provides that the Public Advocate would be appointed by the Mayor with the advice and consent of the Council. Necessarily too, as an executive official, the Public Advocate would be subject to discharge by the Mayor in accordance with applicable law.[7] *See Bowsher v. Synar*, 478 U.S. 714, 726, 106 S.Ct. 3181, 3188, 92 L.Ed.2d 583 (1986). In our judgment, these limitations on the OPA's role and independence are sufficient to overcome the Board's concern that the OPA—a "subordinate" of the Mayor—could intervene and take positions contrary to the Mayor's assessor before the BER, and so undermine the chief executive's authority.

What principally disturbed the Board, however, as we understand its ruling, is not merely that the OPA could challenge the Mayor's preliminary assessment before the BER but that it could appeal final assessments in the courts. Of course, "[a]ny person aggrieved" by an assessment—typically the taxpayer—already may appeal to the courts, and so the issue before us is whether permitting a designated additional person to appeal "in the public interest" fundamentally infringes on the Mayor's authority as described. We find important instruction on this issue in the Supreme Court's decision in *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), analyzing a conceptually similar issue of separation of powers.[8]

---

7. *See* District of Columbia Government Comprehensive Merit Personnel Act of 1978, D.C.Code §§ 1–601.1 to 1–637.2 (1987).

8. Both the Board and the intervenor-appellees dispute the relevance of *Morrison* by asserting that the instant case has nothing to do with the separation of powers, but rather involves only

the issue of whether the electorate "can amend the Charter" when the Council cannot do so except by a specific process. See note 4, *supra*. This argument has no merit. The issue presented would be whether the Council or the electorate can amend the Charter by ordinary legislation (to which the plain answer is no) only if the proposed initiative contravened the Mayor's au-

*Morrison* involved a series of questions concerning the constitutionality of the independent counsel provisions of the Ethics in Government Act of 1978 (the Act), providing for the appointment of an independent counsel to investigate and, if appropriate, prosecute certain high ranking government officials for violations of federal criminal laws. The ultimate question the Court faced was "whether the Act is invalid under the constitutional principle of separation of powers." *Id.* at 685, 108 S.Ct. at 2616. This involved both the narrower issue of whether the Act's provision allowing the Attorney General to remove the independent counsel from office only upon a showing of " 'good cause,' taken by itself, impermissibly interferes with the President's exercise of his constitutionally appointed functions," *id.;* and the broader issue of whether, "taken as a whole, the Act violates the separation of powers by reducing the President's ability to control the prosecutorial powers wielded by the independent counsel." *Id.*

In concluding that the good-cause removal provision alone did not "unduly trammel[ ]" on or "impermissibly burden[ ]" the President's power to control or supervise the independent counsel, *id.* at 691, 692, 108 S.Ct. at 2619, 2620, the Court was satisfied that "the Executive, through the Attorney General, retains ample authority to assure that the counsel is competently performing his or her statutory responsibilities in a manner that comports with the provisions of the Act." *Id.* at 692, 108 S.Ct. at 2619. Turning then to the question whether the Act, "taken as a whole, violates the principle of separation of powers by unduly interfering with the role of the Executive Branch," the Court noted that it had "never held that the Constitution requires that the three Branches of Government 'operate with absolute independence,' " *id.* at 693–94, 108 S.Ct. at 2620–21, *quoting United States v. Nixon,* 418 U.S. 683, 707, 94 S.Ct. 3090, 3107, 41

L.Ed.2d 1039 (1974); rather the question was always whether a particular measure " 'impermissibly undermine[s]' the powers of the Executive Branch," *id.* at 695, 94 S.Ct. at 3101, *quoting Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 856, 106 S.Ct. 3245, 3259, 92 L.Ed.2d 675 (1986), or " 'disrupts the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions,' " *id., citing Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977).

The Court did not deny that the Act reduced the President's control or supervision over the investigation and prosecution of certain alleged criminal activity: "[t]he Attorney General is not allowed to appoint the individual of his choice; he does not determine the counsel's jurisdiction; and his power to remove counsel is limited." *Id.* at 695–96, 94 S.Ct. at 3101–02. The Court concluded, "[n]onetheless, [that] the Act does give the Attorney General several means of supervising or controlling the prosecutorial powers that may be wielded by an independent counsel." The "[m]ost important[ ]" of these was the Attorney General's retention of "the power to remove the counsel for 'good cause,' a power that we have already concluded provides the Executive with substantial ability to ensure that the laws are 'faithfully executed' by an independent counsel." *Id.* at 696, 94 S.Ct. at 3101. This power, combined with the Attorney General's unreviewable discretion not to appoint an independent counsel and ability indirectly to affect the counsel's jurisdiction by the facts submitted to the appointing court, left the Executive Branch "sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties." *Id.*

---

thority under § 448(5) of the Charter, as the Board found. In concluding that "[n]ot even the Council, under our system of government, would have the authority by legislation to superimpose the OPA function on the Mayor," the Board unmistakably found what it perceived to

be a violation of the basic apportionment of authority under the Charter. Although the Board naturally did not engage in separation of powers analysis under the federal constitution, as in *Morrison,* the similarity of the basic issues is manifest.

Our task, in this local dispute over separation of powers, is similarly to decide whether the establishment of the OPA with the authority to contest the Mayor's tax assessments in court "impermissibly burdens" or "unduly interferes with" the Mayor's charter responsibility for tax assessments. The OPA's proposed authority to advocate in court is, to begin with, scarcely comparable to the awesome power to prosecute executive officials given the independent counsel by the Ethics in Government Act. As discussed earlier, creation of the OPA would leave the administrative decisional authority over assessments untouched, and, as to judicial review, it would merely enlarge the class of those persons already allowed to contest the Mayor's assessments. Moreover, quite unlike in *Morrison*, the Mayor would be free to appoint the "individual of his choice" as Public Advocate subject to the advice and consent of the Council. And too, consistent with the factor the Court deemed "most important" in *Morrison*, the Public Advocate's status as an executive official insures that the Mayor would hold the power to discharge him, upon a showing we have no occasion presently to decide. As already demonstrated, the Mayor and Council do not "operate with absolute independence," *Morrison, supra, quoting United States v. Nixon, supra,* in regard to property assessments, and even the BER—an executive agency—performs something of an independent role in the assessment process.

We conclude, all things considered, that the responsibility for tax assessments conferred on the Mayor by Congress is left essentially intact, and hence is not impermissibly burdened, by the proposed initiative.[9]

## II.

■ The Board further concluded that the initiative would expand the jurisdiction of the courts in violation of § 602(a)(4) of the Charter, D.C.Code § 1–233(a)(4), which prohibits the Council (and hence the electorate directly) from enacting any legislation "with respect to any provision of title 11 of the District of Columbia Code (relating to organization and jurisdiction of the District of Columbia courts)." The Board reasoned:

> At the present time, neither the Tax Division of the Superior Court nor the Court of Appeals has jurisdiction over an assessment appeal by a *non-owner of property*. Under this proposed initiative, the court's jurisdiction would be expanded to include non-owners of property and individuals who do not fall within the definition of "aggrieved person" [under D.C. Code §§ 47–825(i) and 47–3303].

We conclude that the Board has erroneously conflated jurisdiction under title 11 and the question of who has standing to appeal under title 47 of the Code.

D.C.Code § 11–1201(1) (1989) provides:

> The Tax Division of the Superior Court shall be assigned exclusive jurisdiction of—(1) all appeals from and petitions for review of *assessments of tax* ... made by the District of Columbia. [Emphasis added.][10]

---

**9.** We reject the additional argument made by the Board for the first time in the Superior Court that the proposed measure would create "a fourth branch of government" because the initiative allows the Public Advocate to "demand a hearing ... under any other provision of law *in any matter or proceeding in which the public advocate may deem the public interest involved....*" Should the Public Advocate take this language, in the Board's words, as "infinite authority ... to pursue matters of unlimited dimension," it would be time enough then for courts to curb a clear abuse of the authority— limited to proceedings respecting the valuation, assessment, or classification of property for tax purposes—granted by the proposed initiative.

**10.** Section 11–1202 reinforces § 11–1201(1) by providing that, "[n]otwithstanding any other provision of law, the jurisdiction of the Tax Division of the Superior Court to review the validity and amount of all assessments of tax made by the District of Columbia is exclusive." Effective "on and after the effective date of the District of Columbia Court Reorganization Act of 1970, [Pub.L. No. 91–358, Title I, 84 Stat. 475 (1970) ]," § 11–1202 abolished "any common-law remedy with respect to assessments of tax in the District of Columbia and any equitable action to enjoin such assessments available in court other than the former District of Columbia Tax Court...."

Nothing on the face of title 11 limits the Tax Division's jurisdiction by reference to who may appeal an assessment; the statute restricts the court's jurisdiction by subject matter, *viz.*, to appeals from "assessments of tax." Thus, this case is quite different from *Capitol Hill Restoration Society, Inc. v. Moore*, 410 A.2d 184 (D.C. 1979), on which appellees rely. In that case the issue was whether this court could review directly an agency decision that did not satisfy the "contested case" limitation imposed on our review of agency action by title 11. We observed that D.C.Code § 11–722, by its terms, enables this court to review agency action "in accordance with the District of Columbia Administrative Procedure Act," which in turn limits our review to contested cases as defined in D.C.Code § 1–1502(8). Thus, we stated, *"pursuant to § 11–722* this court has jurisdiction to review directly agency action taken only in a contested case." *Id.* at 186 (emphasis added). We therefore held that to permit review of the agency decision in that case—which did not result from a "trial-type hearing" required for a contested case—would have "expanded our traditional jurisdictional grant under Title 11 to encompass noncontested cases." *Id.* at 188.

*Capitol Hill* thus dealt with a limitation that title 11 imposes on the kind of agency actions this court may review, and a limitation expressed by title 11 itself (by reference to the Administrative Procedure Act). The initiative in question would not expand the kind of appeals the Superior Court may hear beyond those involving tax assessments, and so does not appear to affect title 11 at all. Appellees argue, however, that it would do so indirectly in the following manner. They state that the phrase "all appeals" in § 11–1201(1) must be understood by reference to the specific "appeal" permitted by title 47,[11] and that cases

antedating the Home Rule Act establish that, as a matter of jurisdiction, appeals from tax assessments can be brought only by "persons aggrieved" in the sense of being *directly and personally affected* thereby. *E.g.*, *National Bank of Washington v. District of Columbia*, 96 U.S. App.D.C. 395, 396–97, 226 F.2d 759, 760 (1953) (District of Columbia Tax Court lacked jurisdiction over appeal from tax assessment because "necessary party"—in form of person whose "individual interests are directly and personally affected" by the assessment—was lacking).

Whatever the jurisdictional validity of an appeal from a tax assessment brought by a party not personally affected prior to the Home Rule Act, we reject the argument that the Charter's prohibition on Council enactments "with respect to title 11" must be read to bar additions to the class of those who may appeal tax assessments under title 47. In *District of Columbia v. Sullivan*, 436 A.2d 364, 366 (D.C.1981), this court pointed out that the restriction against laws affecting the jurisdiction of the courts (at the time D.C.Code § 1–147(a)(4)) was enacted by Congress "to give the newly enacted District of Columbia Court Reorganization Act of 1970[12] an opportunity to prove its effectiveness," noting the following explanation by Congressman Adams in the full committee markup on the Home Rule Act:

> the purpose of this [provision barring amendments to title 11] was the very strong argument made by the court and supported by members of the bar ... that the Reorganization Act had just gone into effect. Therefore, the *structure* of the courts should have an opportunity for that Reorganization Act to be completely carried out.

Staff of House Comm. on the District of Columbia, 93d Cong., 2d Sess., Home Rule for the District of Columbia, 1973–1974,

---

**11.** Section 47–835(i) permits an appeal from a tax assessment "in the same manner and to the extent as provided in §§ 47–3303 and 47–3304." Section 47–3301 defines "appeal" as "the appeal provided in this chapter," and § 47–3303 permits "[a]ny person aggrieved by any assessment by the District of any [one of specified taxes]" to appeal from the assessment to the Superior

Court. Section 47–3304(a) permits review of decisions of the Superior Court in civil taxes by this court "in the same manner as other decisions of the court in civil cases tried without a jury."

**12.** See note 10, *supra*.

1081 (Comm. Print 1974) (emphasis by *Sullivan*).[13] The Court Reorganization Act, as explained above, had given the Tax Division of the Superior Court exclusive jurisdiction of appeals from assessments of tax. In our judgment, an enlargement of the class of persons who may bring such appeals does not affect the "structure of the courts" or the jurisdictional arrangement Congress had decided upon in the Reorganization Act.

In *District of Columbia v. Greater Washington Central Labor Council*, 442 A.2d 110 (D.C.1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983), this court dealt with a similar claim that the Council of the District of Columbia had improperly expanded the jurisdiction of the courts by vesting the Superior Court with the right to enforce workers' compensation awards and this court with the authority to review final compensation orders. We held that the Council "did not affect impermissibly the jurisdiction of the local courts by enacting the Workers' Compensation Act." *Id.* at 117. We observed that "the Superior Court has jurisdiction of any civil action or other matter (at law or in equity) brought in the District of Columbia"; that within the court's general equitable powers is the authority to enforce orders of the Mayor and administrative agencies; and that,

therefore, "the enforcement of a compensation order of the Mayor ... would fall within the equitable jurisdiction *presently vested* in the Superior Court." *Id.* (emphasis added).[14] In the present case, we likewise conclude that appeals by the proposed OPA would fall within the jurisdiction presently vested in the Tax Division over appeals from assessments of tax.[15]

### III.

The judgment of the Superior Court affirming the Board's decision is

*Reversed.*

---

13. *See also* Committee Print at 1358 (statement of Congressman Diggs) ("The judiciary section of [title IV] ... reserves to the Congress the right to modify the composition or the structure or jurisdiction of the courts").

14. We similarly held that, since the provision for an agency hearing under the Workers' Compensation Act satisfied the contested-case limitation on our jurisdiction, "this court will review compensation claims by virtue of its preexisting jurisdiction to review administrative proceedings." 442 A.2d at 117–18.

15. The intervenor-appellees argue that *Greater Washington* is inapposite because enforcement of the compensation orders involved there would occur under the *general* civil jurisdiction of the Civil Division of the Superior Court, whereas the Tax Division has sharply limited jurisdiction. But the relevance of this distinction depends upon appellees' argument that the traditional limitation on the meaning of "persons aggrieved" in regard to tax appeals was a structural or jurisdictional limitation of the sort Congress had in mind in barring Council

amendments to title 11. We have rejected that argument.

As a separate basis for concluding that the proposed initiative would expand the courts' jurisdiction, the Board noted that the measure seemingly would allow the Public Advocate to appeal an assessment without the requirement of D.C.Code § 47–3303 having been met, *viz.,* that the person aggrieved by the assessment first pay the tax under protest. For the reasons stated in the text, however, we do not regard the abstract possibility that the property tax would go unpaid while the Public Advocate appeals as "affect[ing] impermissibly the jurisdiction of the local courts." *Greater Washington Central Labor Council*, 442 A.2d at 117. As a practical matter, and in view of the substantial penalties for failure to pay taxes timely, the likelihood that a tax will remain unpaid while the OPA pursues an appeal (whether allied with the taxpayer or in opposition to him) appears extremely remote. In any case, we need not and do not decide whether compliance with the pre-payment requirement of § 47–3303 is a prerequisite to filing in court by the OPA.