*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-CV-0511

FRATERNAL ORDER OF POLICE
METROPOLITAN POLICE DEPARTMENT LABOR COMMITTEE, APPELLANT,

V.

DISTRICT OF COLUMBIA, *et al*., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2020-CA-003492-B)

(Hon. William M. Jackson, Motion Judge)

(Argued October 5, 2022                    Decided March 2, 2023)

*Anthony M. Conti*, with whom *Daniel J. McCartin* was on the brief, for appellant.

*Megan D. Browder*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia at the time, *Caroline S. Van Zile*, Acting Solicitor General at the time, and *Ashwin P. Phatak*, Deputy Solicitor General at the time, were on the brief, for appellees.

*Jon Greenbaum*, *Arthur Ago*, and *Alexander Brooks* were on the brief for amici curiae Lawyers' Committee for Civil Rights Under Law, Public Defender Service for the District of Columbia, and Washington Lawyers' Committee for Civil Rights and Urban Affairs, urging affirmance.

Before BECKWITH and MCLEESE, *Associate Judges*, and THOMPSON, *Senior Judge*.

THOMPSON, *Senior Judge*: Appellant, the Fraternal Order of Police Metropolitan Police Department Labor Committee, D.C. Police Union ("FOP"), appeals from an order of the Superior Court dismissing FOP's complaint against defendants/appellees the District of Columbia and the Mayor of the District of Columbia (the "Mayor") in her official capacity, for lack of standing and failure to state a claim. FOP argues that, contrary to the Superior Court's ruling, (1) FOP has both organizational and associational standing to bring its claims, and (2) its complaint sufficiently stated a separation-of-powers claim as well as a substantive due process claim for violation of its members' rights to privacy. For the following reasons, we are satisfied that FOP adequately pled associational standing, but we affirm the judgment of dismissal, agreeing with the Superior Court that FOP's complaint failed to state a claim.

## I. Background

In October 2014, the Metropolitan Police Department ("MPD") established the MPD's Body-Worn Camera ("BWC") Program, under which MPD officers are required to wear and activate their body-worn cameras during on-duty interactions

with members of the public. In 2015, the Council of the District of Columbia (the "Council") enacted legislation (Act 21-148) directing the Mayor to "issue rules regarding the Metropolitan Police Department's Body-Worn Camera Program," including "[s]tandards for public access to body-worn camera recordings." 62 D.C. Reg. 10953, 10954 (Aug. 14, 2015). By the end of 2015, however, the Council itself promulgated rules and enacted emergency legislation, D.C. Act 21-253, addressing the release of BWC recordings. *See* 63 D.C. Reg. 271, 274 (Jan. 8, 2016). Under these Council-enacted provisions, and until mid-2020, the Mayor had discretionary authority

> on a case-by-case basis in matters of significant public interest and after consultation with the Chief of Police, the United States Attorney's Office for the District of Columbia, and the Office of the Attorney General, [to] release BWC recordings that would otherwise not be releasable pursuant to a FOIA [(i.e., Freedom of Information Act)] request.

24 D.C.M.R. § 3900.10 (2016). Section 3900.10 further provided that "[e]xamples of matters of significant public interest include officer-involved shootings, serious use of force by an officer, and assaults on an officer requiring hospitalization."

During the summer of 2020, the Council began crafting comprehensive police reform legislation. The Council eventually approved the Comprehensive

Policing and Justice Reform Second Emergency Amendment Act of 2020 (the "Emergency Act"), which the Mayor signed on July 22, 2020. Subtitle B of the Emergency Act amended 24 D.C.M.R. § 3900.10 and D.C. Code § 5-116.33 and required the Mayor to "publicly release the names and [BWC] recordings of all officers who committed the officer-involved death or serious use of force" "[w]ithin 5 business days after an officer-involved death or the serious use of force" and "[b]y August 15, 2020, publicly release the names and [BWC] recordings of all officers who have committed [an] officer-involved death since the BWC Program was launched on October 1, 2014." D.C. Act 23-336, 67 D.C. Reg. 9148 (July 22, 2020). The Emergency Act was renewed via a series of interim, emergency, and temporary legislation that included the same language. As renewed effective August 12, 2022, the Comprehensive Policing and Justice Reform Temporary Amendment Act of 2022, D.C. Law 24-0149 (the "Temporary Act"), 69 D.C. Reg. 11395 (Sep. 23, 2022), expires on March 25, 2023.

On July 31, 2020, the Mayor complied with the Emergency Act and released the names and BWC footage from the inception of the BWC Program that had not previously been released. The Mayor has released a number of BWC recordings since the Emergency Act and its various renewals went into effect.

Approximately two weeks after the Emergency Act was passed, FOP filed its verified complaint against defendants and also moved for a temporary restraining order, but the Superior Court (the Honorable Hiram Puig-Lugo) denied appellant's motion. In October 2020, FOP filed an amended verified complaint challenging the temporary legislation then in effect. The amended complaint seeks a declaratory judgment and injunctive relief and sets out two counts: (1) "Violation of the Separation of Powers" and (2) "Violation of the Due Process Guarantees of [the] District of Columbia Home Rule Act." The provisions of the Temporary Act currently in effect are identical in all material respects to the provisions that FOP challenged in its amended complaint, and we hereafter use the term "Temporary Act" to refer to all versions of the legislation, including the temporary legislation in effect as of the date of this opinion.

Count I of the amended complaint alleges that removal of mayoral discretion over the public release of BWC recordings "improperly usurps the exclusive power of the Mayor[,] in violation of the separation of powers of the [branches of the] District of Columbia government recognized in D.C. Code § 1-301.44(b)." Count I also alleges that "the immediate, mandatory release of [BWC] footage and names of officers will make it *more* difficult to investigate a serious officer-involved death or serious use of force" and will disclose witness identities and "cause . . .

civilian witnesses to become potential targets of threats or violence to prevent their testimony." Count I further alleges that the release of the BWC footage will cause appellant to "expend more resources" to both "publicly defend[] its members who were involved in the serious use of force incident or officer-involved death" and to defend members facing transfers or discipline because their case-closure rates have declined as a result of investigations becoming more difficult. Finally, Count I alleges that appellant "and its members will suffer . . . significant bodily harm and substantial reputational and psychological harm if [the requested] injunctive relief is not granted."

Count II alleges that the temporary legislation "violates the fundamental right to privacy held by [appellant's] members" and "could result in significant bodily harm to officers because the immediate public release of [an] officer's name and the [BWC] footage will allow criminal suspects and their associates to identify [an] officer and potentially seek retribution against the officer and his or her family." Count II also alleges that the temporary legislation "violates the fundamental right to privacy held by all citizens of the District captured on the [BWC] footage because . . . [BWC] footage contains personal, private information about District citizens" and gives "[c]riminal suspects . . . the ability to review the [BWC] footage to identify civilian witnesses to their crimes, which will cause

these civilian witnesses to become the potential targets of violence to prevent their testimony." Count II further alleges that appellant's members will suffer "significant bodily harm and substantial reputational harm" that "far outweigh[s] any injury that might be suffered by [appellees] or any other interested party" if an injunction were granted.

On October 9, 2020, the defendants/appellees filed a motion to dismiss. After a hearing, the Superior Court (the Honorable William M. Jackson) granted the motion. The court first found that FOP lacked organizational standing because "publicly defending its members is part of [FOP's] mission as an organization" and because FOP did not allege that the temporary legislation creates "any impediment to its ability to continue that mission." The court also determined that FOP's allegations that it would have to expend more resources did "not amount to a concrete and imminent injury" because FOP did not allege that the temporary legislation prevents it "from performing tasks or actions that [it] previously could [perform] prior [to] the [legislation]." Last, the court reasoned that FOP's allegations of future injuries were "too speculative to establish organizational standing."

The Superior Court also found that FOP lacked associational standing. It determined that FOP's allegations of reputational and significant bodily harm to its members were "purely speculat[ive] and conclusory." As for the allegation of reputational harm, the court explained that it was "equally likely for someone to reach the conclusion that an officer was justified in utilizing force in a particular instance, which would not result in any reputational harm." Regarding FOP's allegations of physical harm, the court reasoned that FOP's references to an "anonymous social media post and two comments made in relation" to the post discussed *infra* were "insufficient" because "[t]he injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical'" (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). Additionally, the court found that the amended complaint failed to allege how the injuries were "'fairly traceable to the defendant[s'] actions" because defendants "are not in control of public opinion and cannot be held responsible" for criticisms from citizens.

The Superior Court also addressed the merits of FOP's amended complaint. First, it rejected the separation-of-powers claim because "the Council possesses the legislative authority to determine public policy on issues such as the disclosure of public records" and noted that the Mayor and Council do not "operate with complete independence and complete freedom from any influence of the other."

The court further reasoned that the temporary legislation did not impermissibly burden or unduly interfere with the Mayor's responsibilities since the Mayor "still maintains all the resources that she currently possesses, and the statute simply pushes for greater transparency and requires that the public have greater access to information in incidents [involving] serious use[] of police force."

Second, the court rejected FOP's due process claim. It reasoned that there is no recognized constitutional right to "'safeguard personal information' from the criminal acts of third parties" (quoting *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 72 (D.C. Cir. 2019)). The court highlighted that MPD policy "explicitly states that members of the general public have a First Amendment right to record MPD members during official business, unless they interfere with police activity." The court reasoned that "[i]f the public is legally able to record officers . . . it is unclear how any reasonable officer can assume that they have the right to privacy when conducting said official business."

## II.     Standard of Review

"As a motion to dismiss a complaint 'presents questions of law, our standard of review . . . is de novo.'" *Scott v. FedChoice Fed. Credit Union*, 274 A.3d 318, 322 (D.C. 2022) (omission in original) (quoting *Johnson-El v. District of Columbia*, 579 A.2d 163, 166 (D.C. 1990)).  In conducting our de novo review, "we apply the same standard the trial court was required to apply, accepting the [factual] allegations in the complaint as true and viewing all facts and drawing all reasonable inferences in favor of the plaintiff[]." *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 554 (D.C. 2016) (per curiam) (alterations in original) (quoting *Tingling-Clemmons v. District of Columbia*, 133 A.3d 241, 245 (D.C. 2016)).

De novo review equally applies to our review of a dismissal of a complaint for lack of standing. *Equal Rts. Ctr. v. Props. Int'l*, 110 A.3d 599, 603 (D.C. 2015) (per curiam).  The de novo review standard likewise applies to our review of a challenge to the constitutionality of a statute. *District of Columbia v. Towers*, 260 A.3d 690, 693 (D.C. 2021).

## III. Discussion

FOP argues that the Superior Court's order should be reversed because it has both organizational and associational standing and its amended complaint sufficiently stated a claim based on violation of the separation of powers and on a substantive due process violation of its members' "fundamental right" to privacy. Because "[s]tanding is a threshold jurisdictional question which must be addressed prior to and independent[ly] of the merits of any party's claim[s]," we first address the issue of standing. *Equal Rts. Ctr.*, 110 A.3d at 603 (second alteration in original) (quotation marks omitted).

### A. Standing

#### 1. Applicable Law

"Although Congress did not establish [the D.C. courts] under Article III of the Constitution, we generally adhere to the case and controversy requirement of Article III as well as prudential principles of standing." *Nicdao v. Two Rivers Pub.*

*Charter Sch., Inc.*, 275 A.3d 1287, 1291 (D.C. 2022) (citation omitted). "To satisfy Article III's strictures, [a party] must demonstrate an actual or imminent 'injury that is concrete and particularized,' that is 'fairly traceable to the challenged conduct,' and that is 'likely to be redressed by a favorable judicial decision.'" *Youngblood v. D.C. Bd. of Zoning Adjustment*, 262 A.3d 228, 234 (D.C. 2021) (quoting *Little v. SunTrust Bank*, 204 A.3d 1272, 1274 (D.C. 2019)). These standing elements are "an indispensable part of the plaintiff's case," and thus "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). This means that to survive a motion to dismiss for lack of standing, "a complaint must contain sufficient factual matter, accepted as true," to make the claim of injury, traceability, and redressability "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Allegations that are merely formulaic or conclusory will not suffice. *Id.*[1]

---

[1] The parties seem to agree that "for purposes of a motion to dismiss, 'general factual allegations of injury' are sufficient to establish standing." However, that proposition is drawn from cases that either pre-dated or failed to take into account the change effected by *Iqbal* and by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007). "In cases decided before *Iqbal* and *Twombly*, a court presented with an issue of Article III standing would 'presume[] that general allegations embrace those specific facts that are necessary to support the claim.'" *Hawse v. Page*, 7 F.4th 685, 689 n.6 (8th Cir. 2021) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1992) (alteration in original)). "But the Court in [*Nat'l Wildlife Fed'n*] expressly drew that formulation from the

"[O]rganizations, like individuals, have legally protected interests," and "[a]n organization may file suit in its own right 'so long as it satisfies the constitutional requirements and prudential prerequisites of traditional standing analysis.'" *Equal Rts. Ctr.*, 110 A.3d at 603 (quoting *D.C. Appleseed Ctr. for L. & Just. v. D.C. Dep't of Ins., Sec., & Banking*, 54 A.3d 1188, 1205-06 (D.C. 2012)). As to the injury-in-fact element, "an organization's mere interest in a problem or its opposition to an unlawful practice is not sufficient . . ., nor is a simple setback to an organization's abstract social interests." *Id.* at 604 (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). Instead, "[t]he question of standing turns on whether the organization's activities in pursuit of [its] mission have been affected in a sufficiently specific manner as to warrant judicial intervention." *Id.* (second alteration in original) (quoting *D.C. Appleseed Ctr.*, 54 A.3d at 1206). "This requires a showing that the defendant's [allegedly] unlawful actions have caused a 'concrete and demonstrable injury to the organization's activities—with the

---

permissive pleading regime of [*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)], which was retired by *Twombly*." *Hawse*, 7 F.4th at 689; *see also Twombly*, 550 U.S. at 561, 563 (stating that the language from *Conley* — that courts should not dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" — and its literal interpretation as a permissive pleading standard that could allow "a wholly conclusory statement of claim [to] survive a motion to dismiss" had "earned . . . retirement").

consequent drain on the organization's resources.'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Generally, when an organization is forced to divert resources to counteract the effects of another's unlawful acts, it has suffered a sufficiently concrete injury to bestow standing." *Id.*

An organization has associational standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1207 (D.C. 2002) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). To establish standing to defeat a motion to dismiss, an association must plausibly "allege that its members, or any one of them, are suffering immediate *or threatened injury* as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (emphasis added); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021) (recognizing that "a person exposed to a risk of future harm [has standing to] pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial"); *Jibril v.*

*Mayorkas*, 20 F.4th 804, 817 (D.C. Cir. 2021) ("A plaintiff is not required to wait for an injury to occur in order to satisfy Article III standing requirements.").

"[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party . . ., 'standing is not precluded, but it is ordinarily "substantially more difficult" to establish.'" *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (quoting *Lujan*, 504 U.S. at 562). The Supreme Court has further explained that where the "causal relation between [the] injury and [the] challenged action depends upon the decision of an independent third party," a plaintiff must allege "at the least 'that [the] third part[y] will *likely* react in predictable ways,'" *id.* (emphasis added) (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019)), "even if they do so unlawfully." *Dep't of Com.*, 139 S. Ct. at 2566; *see also Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) (explaining that a showing that an injury is "fairly traceable" to the defendant does not require an allegation that "the defendant's actions are the very last step in the chain of causation"). Similarly, "to satisfy the redressability requirement, [the plaintiff] need only show 'a *likelihood*, as opposed to mere speculation, that an injury will be redressed by a *favorable* decision.'" *Youngblood*, 262 A.3d at 236 (quoting *Grayson v. AT & T Corp.*, 15 A.3d 219, 246 (D.C. 2011) (en banc)); *see also Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 74-75, 77 (1978)

(accepting trial court's finding of standing premised on the "substantial likelihood" that the power company would abandon efforts to complete the construction and maintain the operation of its planned nuclear power plants if the court were to invalidate the liability-limiting legislation that the plaintiffs challenged as unconstitutional). The plaintiff need not show that every risk of harm will be eliminated by the relief sought. *See id.* at 77 (finding redressability even though, if the challenged legislation had not been passed, the government "would have undertaken development of nuclear power on its own and the same injuries would likely have accrued to [plaintiffs] from such [g]overnment-operated plants as from privately operated ones"); *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (explaining that to establish redressability, a plaintiff "need not show that a favorable decision will relieve his *every* injury").

### 2. Analysis

Appellees present a substantial argument that FOP does not have organizational standing to maintain this action. Although FOP argues that it will "be forced to divert its resources to publicly defend its members whose identities are disclosed" pursuant to the Temporary Act, it did not plead facts showing or even argue that these expenditures will "'perceptibly impair[]' [its] ability to

achieve" its primary purpose of representing and defending its members.[2] *Molovinksy v. Fair Emp. Council of Greater Wash., Inc.*, 683 A.2d 142, 147 (D.C. 1996) (per curiam). Nor has FOP argued that these anticipated increased expenditures "would inhibit [its] daily operations." *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 323 F.R.D. 54, 63 (D.D.C. 2017). It also has failed "to identify any 'current activities' from which it [will have to] divert[] resources in order to pursue those efforts." *Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021).

However, we discern no need to decide definitively the issue of organizational standing because we are satisfied that FOP sufficiently pled a basis for associational standing. FOP contends that its members satisfy the injury-in-fact prong because the immediate release of BWC footage may cause its members to

---

[2] To the contrary, FOP asserts that it will *continue* to incur expenditures such as it has in the past "to challenge improper transfers of [d]etectives based on a low-[case-]closure rate" (because the release of BWC footage will make it more difficult for MPD detectives to gain the cooperation of witnesses and to solve crimes, which in turn "will negatively impact the careers of its members"). As to FOP's assertion that the Mayor's release of BWC footage will subject FOP members to discipline based on violation of the police union's Collective Bargaining Agreement with MPD, FOP has not shown why the *Mayor*'s action would result in charges that FOP members breached their obligation to maintain the confidentiality of police investigations and in a corresponding increase in the number of grievance matters FOP must handle on behalf of its members. We need not accept as true a legal theory unsupported by fact. *See Iqbal*, 556 U.S. at 678.

suffer reputational, physical, and psychological harms. "[W]e need not determine whether all the putative injuries identified" by FOP are sufficiently concrete so long as we are satisfied that there is a least one identified concrete injury. *See Duke Power*, 438 U.S. at 73.

"At the motion-to-dismiss stage, . . . the question is whether [FOP's] allegations nudge [its standing claim] across the line from conceivable to plausible." *Roy v. Buffalo Philharmonic Orchestra Soc'y, Inc.*, 682 F. App'x 42, 47 (2d Cir. 2017) (quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Iqbal*, 556 U.S. at 680. FOP's amended verified complaint alleges that after the Council acted to mandate disclosures of BWC video footage, and in the wake of an officer-involved shooting on September 2, 2020, "credible death threats" were posted on social media against the officer involved and the officer's family. One threat (which had drawn one "like") stated, "#GREENLIGHT ON ALL #DCPOLICE #KIDS #SINCE THEY #KILLING #OUR #FAMILY #KILL #THEM #NEXT #LETSGO #SOUTHSIDE." Another (which also drew a "like") stated, "shit gone be turnt [sic] up when found out address and where children go to school at!" A third threat (which also had drawn one "like") stated, "we need the police officer [sic] picture so we can see who he is . . . it's not going never be safe for him no more . . . Street Justice is the best Justice

for this cop we need to know who he is a [sic] address and everything." The amended complaint asserts that these threats "requir[ed] an investigation by the MPD's Intelligence Branch." The amended complaint also recites that in anticipation of the release of BWC footage in 2020, several MPD officers accepted the MPD's offer to arrange for local law enforcement to increase the patrol in their neighborhoods in the days surrounding the release of the footage. FOP argues that the District thereby "conceded, through its actions, that the release of BWC footage will result in a risk of significant bodily harm" to FOP members "that is far from speculative."

We conclude that at this stage of the litigation, the foregoing allegations were enough to defeat dismissal for lack of standing. The posted threats specifically refer to the need for information about "who [the officer] is" and to the desire to learn the officer's address so that harm can be done to the officer and the officer's family. Affording FOP "the benefit of all inferences that can be derived from the facts alleged," *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 216 (D.C. Cir. 2010), we are satisfied that the posts threatening harm to an officer and the officer's children — if only the officer involved in the shooting that prompted the post can be identified — suffice to nudge FOP's allegations of imminent threatened injury from conceivable to plausible. *See Blum v. Yaretsky*,

457 U.S. 991, 1000 (1982) (stating that a threat that is not imaginary or speculative may be "sufficiently substantial" to confer standing) (internal quotation marks omitted). The amended complaint plausibly alleges that some members of the public are "*likely* [to] react in predictable ways" (emphasis added) — i.e., with credible threats of physical harm to MPD officers and their families — to the mandated release of BWC footage, "even if they do so unlawfully." *Dep't of Com.*, 139 S. Ct. at 2566.

Further, FOP has plausibly shown both causation and redressability because the law's requirement that the Mayor release the footage directly leads to its members' alleged injuries. The fact that FOP has not shown that a favorable decision would prevent the Mayor from employing her discretion to publish BWC footage and officer names (perhaps on a more relaxed timetable), or would prevent the public from recording and releasing officer-involved interactions, does not mean that the alleged injury from the mandatory-release requirement is not redressable. *See Duke Power*, 438 U.S. at 77.

For the foregoing reasons, we conclude that FOP adequately pled associational standing at the motion to dismiss stage. We therefore proceed to consider whether the amended complaint stated a cognizable claim.

## B. Failure to State a Claim

"The only issue on review of a dismissal [based on failure to state a claim] is the legal sufficiency of the complaint." *Scott v. FedChoice Fed. Credit Union*, 274 A.3d 318, 322 (D.C. 2022) (quoting *Grayson*, 15 A.3d at 228-29). "'To pass muster,' a complaint must 'allege the elements of a legally viable claim, and its factual allegations must be enough to raise a right to relief above the speculative level.'" *Falconi-Sachs*, 142 A.3d at 554 (quoting *Tingling-Clemmons*, 133 A.3d at 245).

### 1. Separation of Powers

FOP's separation-of-powers claim can be summarized as follows: the Temporary Act (1) "impermissibly burdens and interferes with" the Mayor's "direct administrative control" over the MPD; (2) impermissibly interferes with the Mayor's "exclusive executive functions" to preserve the public peace, prevent crime and arrest offenders, protect the rights of persons and of property, and

enforce laws in the District,[3] by making it more difficult to investigate officer-involved deaths or serious uses of force.

This court has long acknowledged that the separation-of-powers principles "as are applicable to the three branches of government at the federal level" likewise "govern the exercise of [each branch's powers] in the District Charter." *Wilson v. Kelly*, 615 A.2d 229, 231 (D.C. 1992); *see also id.* at 232 n.8 ("[S]eparation of powers principles should govern as they may be authoritatively pronounced by the Supreme Court from time to time."). The separation of powers is not implicated where one branch of government merely exercises power in an area in which there is an overlap of responsibility. *Mistretta v. United States*, 488 U.S. 361, 381 (1989) (recognizing that "our constitutional system imposes upon the [three b]ranches [of government] a degree of overlapping responsibility"). The difficult burden a plaintiff bears in stating a separation-of-powers violation is captured by this quotation which the Supreme Court drew from The Federalist papers: "Separation of powers . . . 'd[oes] not mean that these [three] departments ought to have no *partial agency* in, or no *controul* over the acts of each other,'" but instead proscribes measures whereby "the *whole* power of one department is

---

[3] These are duties of the Mayor enumerated in D.C. Code § 5-101.03(1)-(3), (10).

exercised by the same hands which possess the *whole* power of another department." *Id.* at 380-81 (alterations in original) (quoting THE FEDERALIST NO. 47, at 325-26 (James Madison) (J. Cooke ed., 1961)). The separation-of-powers doctrine "is designed to preclude 'encroachment or aggrandizement of one branch [of government] at the expense of the other.'" *District of Columbia v. Fitzgerald*, 953 A.2d 288, 298 (D.C. 2008) (per curiam) (quoting *Clinton v. Jones*, 520 U.S. 681, 699 (1997)). That does not occur where, under a particular measure, "the responsibility . . . conferred on [a branch of government] by Congress is left essentially intact." *Hessey v. Burden*, 584 A.2d 1, 6 (D.C. 1990); *see also Clinton*, 520 U.S. at 702 (explaining that it is error to "presum[e] that . . . even quite burdensome interactions" between the branches of government "necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions").

Consistent with the Supreme Court's separation-of-powers jurisprudence, this court has recognized that the Council "may enact legislation that restricts the actions of the Mayor." *Francis v. Recycling Sols., Inc.*, 695 A.2d 63, 73 (D.C. 1997) (citing *Convention Ctr. Referendum Comm. v. D.C. Bd. of Elections & Ethics*, 441 A.2d 889, 910 (D.C. 1981) [hereinafter *CCRC*] (en banc) (plurality opinion)). The en banc court noted in *CCRC* that how the Mayor carries out her

executive and administrative duties "depend[s] on legislative authorization and funding of the programs to be administered," so that even if the Council "reconsiders the advisability of a project and determines to shut it down," that Council action "cannot be said to interfere with project administration" by the Mayor. *CCRC*, 441 A.2d at 910.

It is with the foregoing background that we must evaluate whether a Council action "interferes with" the Mayor's functions in a way that implicates the separation of powers. Guided by it, we have little trouble concluding that the Mayor's authority as executive to administer the BWC Program through MPD was "left essentially intact" by the Temporary Act, such that there has been no separation-of-powers violation. *See Hessey*, 584 A.2d at 6. For example, although the Temporary Act removes some mayoral discretion regarding the release of BWC video footage, it expressly preserves an important role for the MPD in determining what actions constitute "serious use of force" such that videos depicting them fall within the release mandate. *See* 67 D.C. Reg. 9920, 9925 (Aug. 21, 2020) (providing that "'[s]erious use of force' shall have the same meaning as that term is defined in MPD General Order 901.07, or its successor directive"). The Temporary Act also reserves for MPD the definition of who constitutes a "next of kin" who may object to (and thereby defeat) release of a

BWC video.[4]  *See id.* (providing that "'[n]ext of kin' shall mean the priority for next of kin as provided in Metropolitan Police Department General Order 401.08, or its successor directive").  The Temporary Act also preserved the Mayor's discretion,

> on a case-by-case basis in matters of significant public interest and after consultation with the Chief of Police, the United States Attorney's Office for the District of Columbia, and the Office of the Attorney General, [to] publicly release any . . . BWC recordings [other than those whose release is mandated] that may not otherwise be releasable pursuant to a FOIA request.

*Id.* at 9924.  In short, contrary to FOP's assertion, the Temporary Act does not remove "*all* of the Mayor's *discretion and power* over the release of BWC footage and the identities of officers."

It is true that the Council initially delegated to the Mayor the responsibility to issue rules regarding the MPD BWC Program, including standards for public access.  *See* D.C. Code § 5-116.32(a)(1).  However, the Council may "limit[] the scope of past statutory delegations" without "tread[ing] on executive authority." *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 763 (10th Cir. 2023).

---

[4] As amended by the Temporary Act, D.C. Code § 5-116.33(c)(2)(A) prohibits the Mayor from releasing a BWC recording if the next of kin of a person who died in an officer-involved death or the individual against whom serious use of force was used does not consent to the release.

Indeed, if instead the Mayor had issued a regulation governing public access to BWC recordings and the Council had disagreed with that regulation, then the Council could "pass a law overriding it; such a course of events is not a usurpation of *executive* power but instead a legitimate exercise of *legislative* power." *Id.*

Although FOP's opening brief repeatedly suggests otherwise, the Temporary Act does not encroach on authority of the Mayor that is "exclusive." Under the District's Home Rule Charter, the Mayor — the head of the Executive Branch — does not have exclusive authority to direct the activities of agencies of the Executive Branch such as the MPD. Rather, under § 404(b) of the Charter,[5] codified at D.C. Code § 1-204.04(b), "[t]he Council shall have authority to create, abolish, or organize any office, agency, department, or instrumentality of the government of the District *and to define the powers, duties, and responsibilities of any such office, agency, department, or instrumentality*." (emphasis added); *see also* D.C. Code § 2-503(a) ("The Mayor and the Council shall, for the Mayor and for each subordinate agency, establish or require each subordinate agency to establish procedures in accordance with this subchapter [the Administrative Procedure Act]."). Regarding the MPD, this authority of the Council is recognized

---

[5] The District Charter is "[c]omparable to a state constitution." *Zukerberg v. D.C. Bd. of Elections & Ethics*, 97 A.3d 1064, 1072 (D.C. 2014). The Charter is codified at D.C. Code §§ 1-203.01 to .03, 1-204.01 to .115. *See id.* at 1066 n.4.

by D.C. Code § 5-127.01, a provision that specifically "authorize[s] and empower[s the Council] to make and modify . . . all needful rules and regulations for the proper government, conduct, discipline, and good name of [the] Metropolitan Police force." The Council has exercised that authority through a number of pieces of legislation regulating how MPD carries out its enforcement duties, *see, e.g.*, D.C. Code § 5-115.01(a) (limiting police questioning of arrestees to three hours) and § 5-123.01(a) (prohibiting MPD members from affiliating with organizations advocating strikes), including through measures amended by the Temporary Act, *see* 67 D.C. Reg. at 9921 (amending D.C. Code § 5-125.01 (1986)) (noting the Council's intent to "unequivocally ban the use of neck restraints by law enforcement and special police officers"). Further, the Council has authority that overlaps with the Mayor's duty to protect persons in the District of Columbia, *see* D.C. Code § 5-101.03, in that it has "police power to enact legislation for the protection of residents of the District of Columbia." *Bergman v. District of Columbia*, 986 A.2d 1208, 1229 (D.C. 2010).

Finally, as to FOP's claim that the Temporary Act will make it more difficult for the Mayor to investigate officer-involved deaths or serious uses of force, the answer is that the degree of public access to information about government activities "is a question of policy which a legislative body might

appropriately resolve one way or the other." *Houchins v. KQED, Inc.*, 438 U.S. 1, 12 (1978).[6] FOP's challenge to the policy decision the Temporary Act represents — a balancing of the goals of public accountability and transparency on the one hand, and the (relative) ease of investigation of use-of-force incidents, on the other — "does not implicate separation-of-powers concerns; it merely challenges the wisdom of a legitimate policy judgment made by" the legislature. *Touby v. United States*, 500 U.S. 160, 168 (1991); *cf. Chase Plaza Condo. Ass'n v. JPMorgan Chase Bank, N.A.*, 98 A.3d 166, 177 (D.C. 2014) ("Our role is not to resolve this policy dispute between the parties or to second-guess the policy determinations of the Council.").

For all the foregoing reasons, we affirm the dismissal of Count I on the ground that FOP's complaint failed to state a claim for violation of the separation of powers.

---

[6] Indeed, state legislatures have varied in their approaches to the public disclosure of BWC footage. *See generally* Mary D. Fan, *Privacy, Public Disclosure, Police Body Cameras: Policy Splits*, 68 ALA. L. REV. 395, 413-42 (2016) (noting the differences in state BWC disclosure laws).

## 2. Substantive Due Process

"[S]ubstantive due process protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Jordan v. United States*, 235 A.3d 808, 815 (D.C. 2020) (quotation marks omitted). "The Supreme Court has found comparatively few rights and liberties to be 'fundamental' for due process purposes." *In re W.M.*, 851 A.2d 431, 449 (D.C. 2004). The Court has also "emphasized that we must exercise the utmost care in extending constitutional protection to an asserted substantive due process right, and has only sparingly found rights and liberties to be fundamental and thus protected by due process." *Jordan*, 235 A.3d at 815 (quotation marks omitted).

In the Superior Court, FOP rested its substantive due process argument on the fundamental right to personal privacy recognized in *Roe v. Wade*, 410 U.S. 113, 152-55 (1973). Arguing in the wake of the Supreme Court's decision overruling *Roe*, *see Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022), FOP now rests its "fundamental right" argument on case law acknowledging that MPD officers have a "cognizable privacy interest in the

nondisclosure of their names and other identifying information," *District of Columbia v. Fraternal Order of Police* (*Fraternal Order of Police I*), 75 A.3d 259, 268 (D.C. 2013),[7] and (for officers who are involved in MPD disciplinary proceedings) "far more than a *de minimis* privacy interest in not being publicly identified." *Fraternal Order of Police, Metro. Police Dep't Lab. Comm. v. District of Columbia* (*Fraternal Order of Police II*), 124 A.3d 69, 77 (D.C. 2015).[8]  In FOP's very brief discussion of its substantive due process claim, it does not explain how we should make the leap from a privacy interest to a fundamental right.  Exercising "the utmost care" in considering the asserted substantive due process right and understanding that we should recognize new fundamental rights

---

[7] *Fraternal Order of Police I* involved the District of Columbia FOIA's personal-privacy exemption and whether the exemption prevented the District from disclosing the names of officers who had confidentially emailed the Chief of Police about matters that, "though work-related," were "personal in nature," and who had "relied on the government's pledge of confidentiality."  75 A.3d at 266-67.

[8] *Fraternal Order of Police II* involved privacy interests implicated by FOP's FOIA request for documents relating to "internal disciplinary proceedings against senior" MPD officers.  *See* 124 A.3d at 71.  We held that there is "no cognizable public interest in 'information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct.'"  *Id.* at 77 (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)); *see also United States v. Kingsbury*, 325 F. Supp. 3d 158, 160 (D.D.C. 2018) (stating that "body-worn camera materials 'tend to contain information that implicates privacy concerns'" and referring to the privacy concerns of civilian witnesses and other third parties depicted in the video footage requested by a criminal defendant (quoting *United States v. Johnson*, 314 F. Supp. 3d 248, 257 (D.D.C. 2018))).

only "sparingly," *Jordan*, 235 A.3d at 815, we are unable to conclude that FOP members' privacy interest in their names and in videos of their interactions with the public implicates a fundamental right. We are not aware that any court has ever held that police officers have a fundamental right to the privacy of information about their involvement — while on duty and while in contact with the public they serve — in a shooting or other serious use of force.[9]

Moreover, there is, quite to the contrary, a "'growing consensus' of circuit courts holding that 'there is a First Amendment right to record police activity in public' subject to reasonable time, place, and manner restrictions," *Irizarry v.*

---

[9] The Supreme Court has assumed, without deciding, that there is an "individual interest in avoiding disclosure of personal matters," *NASA v. Nelson*, 562 U.S. 134, 146 (2011) (quoting *Whalen v. Roe*, 429 U.S. 589, 599 (1977)), that is "of constitutional significance," *id.* at 147. In *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998), the Sixth Circuit recognized a constitutional right to informational privacy in the context of "private sexual matters," specifically, a rape victim's "fundamental right of privacy in preventing government officials from gratuitously and unnecessarily releasing the intimate details of the rape where no penalogical purpose is being served." *Id.* at 685-86. The instant case, by contrast, does not involve disclosure of similarly personal matters.

But *see Northington v. Jackson*, 973 F.2d 1518, 1525 (10th Cir. 1992), where the court considered a complaint alleging that a jail guard told inmates that plaintiff Northington, their fellow inmate, was a snitch, a revelation that resulted in Northington's being severely beaten by groups of inmates. The Tenth Circuit held that these allegations could support an Eighth Amendment and a substantive due process claim. *Id.* at 1525 & n.4.

*Yehia*, 38 F.4th 1282, 1291 (10th Cir. 2022) (quoting *Fields v. City of Philadelphia*, 862 F.3d 353, 355-56, 360 (3d Cir. 2017)), which negates officers' reasonable expectation of privacy in their interactions with the public and thus is incompatible with the "fundamental" informational privacy right for officers that FOP posits. To the same point, under MPD General Orders, MPD officers have long been required while in uniform to "wear or display the nameplate and badge issued by the MPD" and may "not alter or cover the identifying information or otherwise prevent or hinder a member of the public from reading the information." D.C. Code § 5-337.01. And almost since the inception of the BWC Program, the Mayor has had express discretionary authority to release such videos and information to the public, which again undermines the members' reasonable expectation of privacy. *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787 (3d Cir. 1994) ("[P]rivacy interests are diminished when the party seeking protection is a public person subject to legitimate public scrutiny."); *see also Garrison v. Louisiana*, 379 U.S. 64, 77 (1964) (stating that there is a "paramount public interest in a free flow of information to the people concerning public officials, their servants"). We agree with amici that "[t]he right to decide how to treat information about public police activities belongs to the government and is not a right belonging to individual officers," much less a *fundamental* right of FOP members.

## IV.  Conclusion

For the reasons discussed above, we hold that while FOP has plausibly alleged associational standing, it has not plausibly alleged a separation-of-powers claim or a substantive due process right-to-privacy claim.  Accordingly, we affirm the trial court's order granting appellees' motion to dismiss.

*So ordered.*